Nicolas C. Wilde (15768)
Law Office of Nicolas C. Wilde LLC
32 W. 200 S. PMB # 123
Salt Lake City, Utah 84101
T. 801-949-3088
nick@ncwildelaw.com

*Attorney for Gabriel Alexis Perez-Espinoza*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**Gabriel Alexis Perez-Espinoza**<br><br>Defendant. | **Memorandum in Support of Motion to Suppress**<br><br>Case No. 2:21-cr-361<br><br>District Judge Ted Stewart |

Gabriel Alexis Perez-Espinoza ("Mr. Perez-Espinoza"), through undersigned counsel, respectfully submits the following Memorandum in Support of his Motion to Suppress and respectfully requests that the Court suppress all evidence found in the vehicle and to suppress any statements that Mr. Perez-Espinoza made relating to this case under the Fourth and Fifth Amendments of the United States Constitution.

### Relevant Background

The Sealed Indictment in this case was filed on August 5, 2021. (ECF No. 8.) The Indictment charged Mr. Perez-Espinoza with one count of possession of methamphetamine with intent to distribute; one count of possession of heroin with intent to distribute; and one count of reentry of a previously removed alien. (ECF No. 8 at 1–2.)

Agent Smith testified that in late 2020 he began his involvement with a confidential source. (Transcript at 9.)  He also testified that on July 26, 2021, he "received information" from that "confidential source that the source had been in touch with" an individual named Pedro Meza. (Transcript at 9.) Agent Smith testified that Meza provided a phone number ending in 3145 to Agent Smith "as [a] Utah point of contact to obtain drugs." (Transcript at 9.) Smith indicated that the confidential informant "contacted 3145 and discussed with that person," "the user of 3145," "about purchasing pound quantities of methamphetamine." (Transcript at 9.)

Agent Smith testified that later, his agents "asked for a meeting . . . for a controlled purchase." (Transcript at 10.) Agent Smith also testified that Task Force Officer Johnny Ngo applied for and received a ping warrant on July 29, 201. (Transcript at 10.) The "affidavit for search warrant" stated that "[o]n the item(s) described as" a Cricket Telephone Number 3145, [c]urrently subscribed through Cricket," "[i]n **the City of Salt Lake** . . . there is **now** certain property or evidence described as:"

> Historical electronic information or real or near real time 'pinging' or electronic tracking device information, for the period beginning on the date an Order is signed, for a period of thirty days, to include:
>
> •      Call Origination/Termination Location, Latitude and Longitude
> •      Physical address of all cell sites and Towers in Utah pinging to cellular number 3145.
> •      GPS (global position service) information . . . .

(Defendant's Exhibit # 2.) On July 29, 2021, State Judge Randall Skanchy issued the warrant. (Defendant's Exhibit # 3.) Like the affidavit, the search warrant provided: "[i]n **the City of Salt Lake** . . . there is **now** certain property or evidence described as . . . [p]hysical address of all cell sites and Towers **in Utah** pinging to cellular number 3145." (Defendant's Exhibit # 3 (bold added).)

After obtaining the warrant, agents began "receiving ping intercept data" later that afternoon. (Transcript at 10.) The agents observed that the "location data for 3145 indicated that the phone" "was in California." (Transcript at 10.) After learning that the phone was not in Utah, the agents "proceeded with the attempt at a controlled purchase." (Transcript at 11.)

Case agents instructed the confidential source to contact the local courier at the phone ending in 3145. (*See* Transcript at 11.) According to Agent Smith, "3145 relayed to the informant that the user of 3145 was out of the state and he would have to send his co-worker . . . ." (Transcript at 11.) Agents established surveillance at the Fashion Place Mall and observed a Hispanic male driving a silver Honda Ridgeline enter the confidential informant's vehicle and conduct a controlled purchase of ten ounces. (Transcript at 12.)

Later, on July 31, 2021, agents observed that the phone ending in 3145 "had returned to Utah." Agent Smith contacted "Officer Hurst of Juab County." (Transcript at 15.) Hurst "established surveillance on I-15" and "relayed to [Smith] that the only vehicle that he observed that was suspicious in appearance was a white Ford F-150 with California plates and it had very dark taillight covers." (Transcript at 15.) Agent Smith did not explain why Officer Hurst believed the F-150 was suspicious. (*See* Transcript.)

Agent Smith testified that "[a]fter 3145 came into the Salt Lake Valley, [agents] observed that it stopped in Lehi." (Transcript at 16.) Task Force Officer "Ngo traveled to the area and in driving around the neighborhood, he observed the same Honda Ridgeline" involved in the controlled buy "was parked" in front of a residence in Lehi, Utah. (Transcript at 16.) Ngo "did not see the F-150" during this surveillance. (Transcript at 16.)

Later, on August 1, 2021, Agent Smith noticed the phone ending in 3145 "again departed the State of Utah and headed south towards California." (Transcript at 17.) Agent Smith testified

that after the phone exited Utah, the task force "conduct[ed] spot-checks" "to not determine

wherein California the subject is, other than to identify any reentry into the State of Utah."

(Transcript at 17.)

 Agent Smith testified that "[o]n August 3rd early in the morning," he "check[ed] the

location data" for 3145 and observed that "it had already entered the State of Utah, near Kanab . .

. ." (Transcript at 18.) "After some discussion," Smith's team "made the decision to again try to

interdict the vehicle and make a stop to locate drugs if they were concealed in the vehicle."

(Transcript at 18.) At this time, they "were not sure of the vehicle." (Transcript at 18.) "The only

possible vehicle description we had was the white truck which was relayed to [them] from

Deputy Hurst from Juab County." (Transcript at 18.)

Agent Smith testified that he contacted highway patrol and the Utah County Sheriff's

Office and relayed the description of the F-150 to them. (Transcript at 20.) Agent Smith "relayed

basically to try to attempt at a moving violation or traffic violation, but that the reason behind the

request was it was a drug load . . . ." (Transcript at 21.) Later, Agent Smith "received a phone

call from one of the deputies with Utah County that one of their deputies had seen the truck that

fit the description . . . and that they were going to try to get a stop on it." (Transcript at 21.) They

eventually "told [Smith] that they had pulled the truck over on Highway 6 . . . ." (Transcript at

21.) Agent Smith testified that they "knew [they] had the right vehicle stopped because the

location didn't' change after the truck was stopped." (Transcript at 21.)

Sergeant King testified that Deputy Hutchings "initiate[d] a traffic stop for" taillights at

approximately 10:21. (*See* Transcript at 42; 48.) Sergeant King also had no reason to dispute that

Deputy Hutchings completed all computer checks by 10:22:34. (Transcript at 50.) Sergeant King

also had no reason to dispute that Deputy Sorenson, the K9 deputy, arrived at the scene

approximately four minutes after Deputy Hutchings would have completed all computer checks. (*See* Transcript at 50; RPT-CU911-01-00003; RPT-UCSO-01-00002.)

"After a drug-detecting canine altered to the front of the truck deputies detained both PEREZ and PENA." (SW-01-0002.03 (bold added).) After being detained, "[a]gents spoke to both PEREZ and PENA . . . as both were detained while other agents searched the truck." (SW-01-0002.03 (bold added).) "Agents continued to search the truck and identified two cellular phone sitting in the center console cup holder together." (SW-01-0002.03.) One of the two phones had a red case. (RPT-DEA-01-00002.03.)

Later, "Agents transported the white F-150, PENA, and PEREZ to the DEA Office in Salt Lake City." (SW-01-0002.04.) Agent Smith testified that he transported "Pena, not Perez" to the D.E.A. office. (Transcript at 33.) He also testified that he spoke to both Perez and Pena "on scene at the traffic stop and again at" the DEA office. (Transcript at 33.)

Agent Smith testified that Mr. Perez-Espinoza, pre-*Miranda*, at the traffic stop, admitted that the two phones in the console were his. (Transcript at 35.) But in one of his reports, Agent Smith wrote: "Once at the DEA Office, SA Smith asked PEREZ which cell phones from the truck were his, and PEREZ replied that both phones from the center console were his." (RPT-DEA-01-00002.03 (bold added).) Agent Smith wrote in a report that phone 3145 was the phone in the red case. Agent Smith testified that Mr. Perez-Espinoza made the statement about denying ownership of the phone in the red case "post Miranda." (Transcript at 35.)

## Argument

As explained below, Mr. Perez-Espinoza respectfully requests that the Court suppress all evidence found in the vehicle and suppress any statements that Mr. Perez Espinoza made relating to this case because **(I)** all evidence discovered is fruit of the unlawful pings of phone 3145.

But even if Mr. Perez-Espinoza's first argument fails, the evidence must be suppressed because **(II)** there was not reasonable suspicion to pull Mr. Perez-Espinoza over based on the drug investigation and **(III)** the deputies unlawfully extended the traffic stop. Finally, **(IV)** Mr. Perez-Espinoza respectfully requests that the Court suppress his statement that the phone belonged to him because that statement was made in violation of *Miranda*.

## I.    All Evidence in this Case Must Be Suppressed Because it is the Fruit of the Poisonous Pings of Phone 3145.

An investigative technique "known as GPS 'pinging' relies on carrier-generated data about a cell phone's location." *United States v. Thorne*, 548 F. Supp. 3d 70, 115 (D.D.C. 2021). Pings look "to the phone's 'GPS location, which is generated by triangulating the cell phone's position by reference to three or more network satellites' that connect to the phone." *Id.* (citing *United States v. Caraballo*, 831 F.3d 95, 99 (2d Cir. 2016)). "The GPS data produced by the three satellites 'reveal the latitude and longitude coordinates of the cell phone . . . .'" *Id.* (citation omitted). "The GPS data produced by the three satellites 'reveal the latitude and longitude coordinates of the cell phone . . . .'" *Id.* (citation omitted). "If, however, only one or two satellites are connected to a cell phone at the moment when GPS data is sought, 'the ping produces only the phone's less precise, cell-tower location.'" *Id.* (citation omitted).

"GPS-based location information can be generated 'only at the specific command of' the network carrier, 'an action called pinging.'" *Id.* at 115–16 (citation omitted); *see also United States v. Abarca*, No. 1:12CR29-MW/GRJ, 2014 WL 12641951, at *12 (N.D. Fla. Nov. 20, 2014) ("the cell phone location pings are not voluntarily conveyed to the phone company in the ordinary course of business."). "Pinging refers to 'a service provider's act of proactively identifying the real-time location of the cell phone when the cell phone would not ordinarily transmit its location on its own.'" *Id.* at 116 (citation omitted). "A ping warrant orders a cellular

6

telephone company to affirmatively create evidence about the whereabouts of a particular cellular telephone at the direction of law enforcement." *Matter of Search of a Cellular Tel.*, 430 F. Supp. 3d 1264, 1273 (D. Utah 2019).

Here, all evidence in this case must be suppressed because it is derived from the fruit of the poisonous ping searches of the phone ending in 3145. As explained below, **(A)** cellphone pings are a search under the Fourth Amendment; **(B)** Mr. Perez-Espinoza has standing to challenge the validity of those pings (searches); **(C)** the cellphone pings violated Mr. Perez-Espinoza's rights under the Fourth Amendment; and **(D)** all evidence was obtained as a result of the unlawful pings of phone 3145 and is therefore fruit of the poisonous tree and must be suppressed.

### A. The Cellphone Pings Are a Search Under the Fourth Amendment.

The cellphone pings here constitute a search under the Fourth Amendment because officers were able to track phone 3145 to a residence and the tracking lasted several days. *See United States v. Baker*, 563 F. Supp. 3d 361, 381 (M.D. Pa. 2021) ("the court concludes that the government's requested ping of Defendant Baker's cellphone in this case constitutes a Fourth Amendment search."); (where "the ping . . . located [the] [d]efendant in a private house."); *see also United States v. Broderick*, No. 5:22-CR-00251-EJD-1, 2024 WL 295293, at *6 (N.D. Cal. Jan. 25, 2024) ("Although *Carpenter* addressed only historical CSLI, many courts in this District and across the country have found that 'its reasoning applies to real-time CSLI.'").[1]

Here, Agent Smith testified that his team began receiving "ping intercept data" on the afternoon of July 29, 2021, (Transcript at 10) and continued to receive that data through August

---

[1] As the Court is aware, not all of the ping emails created in this case were provided to Mr. Perez-Espinoza because the United States failed to preserve them. Mr. Perez-Espinoza respectfully submits that the court should assume that the deleted evidence would have shown that he was present in locations more than public highways.

3, 2021—the day of the traffic stop at issue. (Transcript at 18.) Agent Smith also agreed that Task Force Officer Ngo "was able to go to [a] residence based off the ping warrant that the agents had obtained." (*See* Transcript at 25–26); (*see also* Transcript at 16 ("After 3145 came into the Salt Lake Valley we observed that it stopped in Lehi. T.F.O. Ngo traveled to the area and in driving around the neighborhood, he observed the . . . Honda Ridgeline . . . was parked at 642 Lakeview.").

Here, because the agents were able to track phone 3145 to a residence, and were tracking the phone for several days, the pinging of the phone unquestionably constitutes a search under the Fourth Amendment. *See Baker*, 563 F. Supp. 3d at 381 ("Whereas the tracking in *Hammond* did not contravene society's expectation of privacy or law enforcement's capabilities, because it captured Hammond's location on a public road, the ping here located Defendant Baker in a private house.").

**B.  Mr. Perez-Espinoza Has Standing to Challenge the Validity of the Pings of Phone 3145.**

"It is well-established that 'the Fourth Amendment is a personal right that must be invoked by an individual.'" *United States v. Poe*, 556 F.3d 1113, 1121 (10th Cir. 2009). "Therefore, a defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search." *Id.* "Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable." *Id.*

A law enforcement officer's affidavit of probable cause indicating that a cellphone belongs to a particular defendant is sufficient to establish the defendant's standing in the cellphone for purposes of a ping search. *United States v. Baker*, 563 F. Supp. 3d 361, 374 (M.D. Pa. 2021) ("The affidavit of probable cause in support of the search warrant signed by the same

officers also indicates that the Sprint cellphone belongs to Baker. These documents suffice to show that Defendant Baker has a privacy interest in the cellphone on which the ping was conducted and has standing to bring this motion to suppress.").

Here, Agent Smith testified that prior to Mr. Perez-Espinoza being administered his *Miranda* rights, "he claimed the phone ownership" of phone 3145 "in the field prior to arrival at the [DEA] office." (*See* Transcript at 35.) Further, Agent Smith testified that he "believe[d] [Mr. Perez-Espinoza] had control over the phone" and testified that, in his experience, "a phone that is used purely for drug trafficking will often be used by a subject in concert with a personal phone." (Transcript at 35). Agent Smith was under oath when he testified at the suppression hearing. (Transcript at 5.) Agent Smith's testimony that he believed Mr. Perez-Espinoza had control over the 3145 phone—alone—is sufficient for Mr. Perez-Espinoza to establish standing. *C.f. Baker*, 563 F. Supp. 3d at 374. Mr. Perez-Espinoza's demonstration of standing is bolstered by Agent Smith's testimony that Mr. Perez-Espinoza—pre-*Miranda*—indicated ownership of the phone.

Mr. Perez-Espinoza has established standing.

### C.  The Cellphone Pings of Phone 3145 Violated Mr. Perez-Espinoza's Rights Under the Fourth Amendment.

The cellphone pings of phone 3145 violated Mr. Perez-Espinoza's rights under the Fourth Amendment and were unlawful for several reasons: **(1)** the state judge did not identify the source of his authority to issue the ping warrant; **(2)** the Utah Constitution and our Nation's common law restrain the authority of a Utah state judge to the geographic limits of the state of Utah; **(3)** the state judge could not have relied on the federal All Writs Act as a basis of his authority to issue the ping warrant; **(4)** the pings were unlawful *ab initio* because they exceeded the permissible bounds of the language of the warrant; **(5)** assuming the language of the ping warrant allowed for a search beyond Utah, the search warrant was *ultra vires* and *void ab initio* because it

went beyond the issuing state judge's jurisdiction pursuant to the state Constitution and our common law; and **(6)** the text of the search warrant contains no provision requiring the service provider of the cellphone to ping phone 3145.

1. The State Judge Did Not Identify the Source of His Authority to Issue the Ping Warrant.

    The state judge did not identify the source of his authority to issue the ping warrant. (*See* Defendant's Exhibit # 3.)

2. The Utah Constitution and Our Nation's History and Tradition Limit the Authority of a State Judge to the Geographic Confines of that State.

Article VIII Section 1 of the Utah Constitution provides:

> The judicial power **of the state** shall be vested in a Supreme Court, in a trial court of general jurisdiction known as the district court, and in such other courts as the Legislature by statute may establish. The Supreme Court, the district court, and such other courts designated by statute shall be courts of record. Courts not of record shall also be established by statute.

Utah Const. art. VIII, § 1 (bold added). The text of this provision of the Utah Constitution supports the supports the proposition that the judicial power of the State is limited in geographic scope. It does not extend beyond the State of Utah.

The limitations on a state judge's judicial powers to the geographic scope of the State is also supported by our common law and our nation's history and traditions. *See United States v. Krueger*, 809 F.3d 1109, 1125 (10th Cir. 2015) (Gorsuch, J. concurring) (citation omitted) ("But our whole legal system is predicated on the notion that good borders make for good government, that dividing government into separate pieces **bounded both in their powers and geographic reach** is of irreplaceable value when it comes to securing the liberty of the people.") (bold added).

3.  <u>The State Judge Could Not Have Relied on the Federal All Writs Act to Issue the Ping</u>
    <u>Warrant.</u>

A former magistrate judge for the District of Utah held in 2019 that federal judges must turn

to the All Writs Act as a source of their authority to issue a ping warrant. But the state judge who

issued the ping warrant could not have relied on this authority.

In *Matter of Search of a Cellular Tel.*, 430 F. Supp. 3d 1264 (D. Utah 2019), Magistrate

Judge Furse explained that "[a] ping warrant does something distinctly different" from both (1) a

"search and seizure warrant" and from (2) "an anticipatory warrant or tracking warrant." *Matter*

*of Search of a Cellular Tel*, 430 F. Supp. 3d at 1273. Judge Furse explained that "[s]earch and

seizure warrants generally allow law enforcement to collect evidence already in existence[.]" *Id.*

And she explained that "an anticipatory warrant or a tracking warrant authorize the collection of

evidence to be created by the **defendant's actions** in the near future." *Id.* (bold added). But a

ping warrant is different because it "orders a cellular telephone company to affirmatively create

evidence about the whereabouts of a particular cellular telephone at the direction of law

enforcement." *Id.*

Judge Furse explained that neither the (1) Pen Register and Trap and Trace Statute nor

(2) the Store Communications Act "involve this type of affirmative participation in an

investigation." *Id.* "To obtain that authority," Judge Furse explained, "one must turn to the All

Writs Act." *Id.* "The All Writs Act enables **federal courts** to 'issue all writs necessary or

appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of

law.'" *Id.* (quoting 28 U.S.C. § 1651); *see also* 28 U.S.C. § 1651 ("The Supreme Court and **all**

**courts established by Act of Congress** may issue all writs necessary or appropriate in aid of

their respective jurisdictions and agreeable to the usages and principles of law.").

Here, the Third District Court in and for Salt Lake County, State of Utah is not a court established by Act of Congress. Thus, the state judge could not rely on the All Writs Act to issue the ping warrant.

4.  The Pings Were Unlawful *Ab Initio* Because They Exceeded the Permissible Bounds of the Language of the Warrant.

The pings were unlawful *ab initio* because they exceeded the permissible bounds of the language of the warrant, which appears to indicate that the pinging would be limited to Utah. The warrant provided, in relevant part: "[o]n the item(s) described as" a Cricket Telephone Number 3145, [c]urrently subscribed through Cricket," "[i]n **the City of Salt Lake, State of Utah**, there is **now** certain property or evidence described as:"

> Historical electronic information or real or near real time 'pinging' or electronic tracking device information, for the period beginning on the date an Order is signed, for a period of thirty days, to include:
>
> •    Call Origination/Termination Location, Latitude and Longitude
> •    Physical address of all cell sites and **Towers in Utah** pinging to cellular number 3145.
> •    GPS (global position service) information . . . .

(Defendant's Exhibit # 3 (bold added).) As can be seen, the language of the warrant appears to be limited to the geographic scope of the State of Utah.

The search (the pinging of the phone) therefore violated the Fourth Amendment because the search exceeded the scope of the warrant's authority from its inception. Indeed, Agent Smith testified that when his team began receiving the location data, the phone ending in 3145 was "in California." (Transcript at 10.)

5. Assuming the Language of the Ping Warrant Allowed for a Search Beyond Utah, the Search Warrant Was *Ultra Vires* and *Void Ab Initio* Because It Went Beyond the Issuing State Judge's Jurisdiction Pursuant to the Utah Constitution and Our Nation's History and Tradition.

"When interpreting the Fourth Amendment [judges] start by looking to its original public meaning—asking what 'traditional protections against unreasonable searches and seizures' were afforded 'by the common law at the time of the framing.'" *United States v. Krueger*, 809 F.3d 1109, 1123 (10th Cir. 2015) (Gorsuch, J. concurring) (citation omitted). "Whatever else it may do, the Fourth Amendment embraces the protections against unreasonable searches and seizures that existed at common law at the time of its adoption, and the Amendment must be read as 'providing *at a minimum*' those same protections today." *Id*. (Gorsuch, J. concurring) (citation omitted).

"The principle animating the common law at the time of the Fourth Amendment's framing was clear: a warrant may travel only so far as the power of its issuing official." *Id*. at 1124, (Gorsuch, J. concurring). Indeed, "looking to the common law at the time of the framing it becomes quickly obvious that a warrant issued for a search or seizure beyond the territorial jurisdiction of a magistrate's powers . . .  was treated as no warrant at all . . . as null and void without regard to potential questions of 'harmlessness' (such as, say, whether another judge in the appropriate jurisdiction would have issued the same warrant if asked)." *See id*. at 1123, (Gorsuch, J. concurring); *see also* Thomas M. Cooley, The General Principles of Constitutional Law in the United States of America 210 (1880) (noting that a warrant must issue from "a court or magistrate empowered by the law to grant it").

"At the time the Bill of Rights was adopted, a warrant issued in one English county was not valid in another county unless a justice of the peace in that county 'backed' the warrant." *Engleman v. Deputy Murray*, 546 F.3d 944, 948 (8th Cir. 2008). "Under a historical

understanding of the Fourth Amendment, the jurisdiction of the issuing judge and the executing officer is limited, and **a warrant is not valid** if an officer acts outside of that limited jurisdiction." *Id*. at 948–49 (bold added).

"More recent precedent follows this long historical tradition, marching in support of the same conclusion." *Id*. at 1124, (Gorsuch, J. concurring). Indeed, "[t]ime and again state and circuit courts have explained that this means a warrant issued in defiance of positive law's restrictions on the territorial reach of the issuing authority will not qualify as a warrant for Fourth Amendment purposes." *Id*. at 1124, (Gorsuch, J. concurring). Indeed, "[a]llowing one state's court to determine when property, residences, and residents of another state may be subject to search and seizure would trample the sovereignty of states to determine the procedures by which a warrant may be issued and executed and of their courts to determine the consequences of a failure to follow those laws." *State v. Jacob*, 2009-Ohio-7048, ¶ 25, 185 Ohio App. 3d 408, 415, 924 N.E.2d 410, 415–16.

Again, Agent Smith testified that when his team began receiving the location data, the phone ending in 3145 was "in California." (Transcript at 10.) Because the phone was outside the state judge's limited jurisdiction, he had no authority to authorize the ping of the phone (a Fourth Amendment search). The search warrant was therefore "null and void without regard to potential questions of 'harmlessness.'" *Kruegar*, 809 F.3d at 1123, (Gorsuch, J. concurring). The ping violated Mr. Perez-Espinoza's rights under the Fourth Amendment.

6. <u>The Text of the Search Warrant Contained No Provision Requiring the Service Provider to Ping Phone 3145.</u>

The search warrant at issue here was constitutionally infirm because it contained no language requiring the service provider to ping phone 3145. On information and belief, the accepted practice for a judge to issue a ping warrant is to include language ordering "the Target

Device's service Provider" to "require the Provider to remotely query the Target Device's enhanced-911 (E911) global positioning system (GPS) or network signal triangulation capabilities." Here, in contrast, the search warrant contains no such language. (*See* Defendant's Exhibit # 3.) Instead, the search warrant creates the impression that the ping data is already on the phone. (*See* Defendant's Exhibit # 3 ("there is now certain property or evidence . . . .").)

Because the warrant contained no language related to the service provider pinging the cell phone, the pinging by the service provider was not authorized by the Magistrate. As such, the pinging was unlawful under the Fourth Amendment.

**D. All Evidence Derived in this Case Was Obtained as a Result of Unlawful Pings of Phone 3145 and Is Therefore Fruit of the Poisonous Tree and Must Be Suppressed.**

Assuming without conceding that Mr. Perez-Espinoza lacks the requisite possessory interest in the vehicle that was searched, he may "nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000). "A defendant must make a two-part showing to suppress evidence as the fruit of an unlawful detention: first, 'that the detention did violate his Fourth Amendment rights,' and second, that there is 'a factual nexus between the illegality and the challenged evidence.'" *United States v. Dixon*, 157 F. Supp. 3d 1025, 1031 (D. Kan. 2016) (citation omitted). "If the defendant makes that showing, the government must then prove that the evidence is not the fruit of the poisonous tree . . . ."

Here, (**1**) Mr. Perez-Espinoza's detention violated his Fourth Amendment rights; (**2**) there is a factual nexus between the illegality and the challenged evidence; and (**3**) the evidence was not discovered through valid, independent means.

1. <u>Mr. Perez-Espinoza's Detention Violated His Fourth Amendment Rights.</u>

Here, Mr. Perez-Espinoza's detention violated his Fourth Amendment rights because the detention was the fruit of the poisonous ping searches. As a result of the ping searches:

1. Agents observed phone 3145 in California on July 29, 2021—meaning the phone was outside of Utah at the time the warrant issued. (Transcript at 10.)

2. Agents received at least 273 emails from AT&T with the phone's location data. (*See* Transcript at 29; ECF No. 96 at 1.[2])

3. Agent Smith contacted Officer Hurst on July 31st, 2021, using the ping data location for phone 3145 and Officer Hurst was able to identify the white Ford F-150 based on the "location of the device." (*See* Transcript at 15–16.)

4. Task Force Officer Ngo traveled to a residence in Lehi, Utah and observed the Honda Ridgeline previously spotted at a controlled drug buy. (Transcript at 16.)

5. Agent Smith noticed that phone 3145 "departed the State of Utah" on August 1, 2021, and "headed south towards California." (Transcript at 17.)

6. Agent Smith wrote in one report that "3145 . . . departed the state of Utah and traveled to Los Angeles, California, then to Phoenix, Arizona." (RPT-DEA-01-00006.)

7. On August 3, 2021, the Agent Smith observed phone 3145 near Kanab, Utah. (Transcript at 18.[3])

---

[2] As the Court has already recognized, not all of the ping data was produced in this case. (*See* ECF No. 96 at 2 ("The ping data was never produced to Defendant . . . ."); (*see also* ECF No. 96 at 9 ("while the government curiously decided not to . . . provide the Court with an explanation regarding . . . its failure to preserve the ping data . . . .").)

[3] Agent Smith suggested that after phone 3145 exited Utah, his team conducted "spot-checks," which he described as "a review every six hours or so of the G.P.S. location," in "an attempt to not determine where in California the subject is, other than to identify any reentry into the State of Utah." (Transcript at 17.) It is well-established that "corporations are charged with knowledge of information known to their officers" and well-established that because "officers are charged with knowledge of information in corporate books and **records**, corporate entities also have constructive knowledge of the contents of their records." *Helton v. AT & T Inc.*, 709 F.3d 343, 356 (4th Cir. 2013) (bold added); *see also Young v. NPAS, Inc.*, 361 F. Supp. 3d 1171, 1186 (D. Utah 2019) ("the court rejects

a. In his report, Agent Smith wrote that "[o]n August 3, 2021, agents observed that 3145 was entering southern Utah then into Utah **from north of Phoenix, Arizona** . . . ." (RPT-DEA-01-00006 (bold added).)

8. "The only possible vehicle description that [the agents] had was the white truck which was relayed to [them] from Deputy Hurst from Juab County." (Transcript at 18.)

9. Agent Smith "contact[ed] as many local law enforcement officers" as he could "and tr[ied] to line up anyone who could respond to the area of the location for 3145 as it continued north." (Transcript at 20.)

10. Agent Smith "relayed basically to try to attempt at a moving violation or traffic violation, but that the reason behind the request was it was a drug load . . . ." (Transcript at 21.)

11. Based on the information that Agent Smith relayed to the Utah County deputies, they pulled the Ford F-150 over. (*See* Transcript at 21.)

As can be seen, Mr. Perez-Espinoza's detention was only possible because of the pings of phone 3145. Without the ability to ping the phone, the agents would never have been able to identify the Ford F-150. Without the ability to identify the Ford F-150, the agents would never have been able to detain Mr. Perez-Espinoza. Mr. Perez-Espinoza's detention was unlawful because it was directly tied to the pings of phone 3145—which were *void ab initio* and based on an *ultra vires* warrant. *See Krueger*, 809 F.3d at 1124 (Gorsuch, J. concurring).

---

Medicredit's arguments that it should not be charged with knowledge of its own records. Mr. Wright's deposition reveals that Medicredit's representatives had access to the Medicredit Account notes.").

Here, Mr. Perez-Espinoza's position is that the United States should be charged with constructive knowledge of the contents of its records—including the ping data tracking phone 3145 through California and Arizona. If corporations are charged with such knowledge—where no individual's personal liberty is at stake—so too should the United States.

Because the ping warrant here was invalid from its inception, none of the evidence derived from the ping searches is admissible. Mr. Perez-Espinoza's detention was therefore unlawful and in violation of his Fourth Amendment rights.

2. There Is a Factual Nexus Between the Illegality and the Challenged Evidence.

"The next inquiry . . . is whether there is a factual nexus between the unlawful detention and the discovery of contraband." *United States v. Dixon*, 157 F. Supp. 3d 1025, 1031 (D. Kan. 2016). "This has been further explained as a showing that 'the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.'" *Id.* (citation omitted). Here, the evidence would not have come to light but for the Government's unconstitutional ping searches. Again, without the ping searches, the United States would never have obtained the description of the Ford F-150 and would not have been able to intercept that vehicle and detain Mr. Perez-Espinoza. Without the unconstitutional conduct, the evidence sought to be suppressed would never have been discovered. Mr. Perez-Espinoza satisfies this inquiry.

3. The Evidence Was Not Discovered Through Valid, Independent Means.

Mr. Perez-Espinoza anticipates that the United States will argue that the alleged traffic violations provide the United States with a valid, independent means of discovery of the evidence. Those arguments will fail because (i) the traffic stop of the Ford F-150 was made at the request of the DEA agents—who were only able to identify that vehicle based on the unlawful pings of phone 3145 and (ii) the Utah County deputies unlawfully extended the traffic stop.

i.    *The Traffic Stop Is Fruit of the Poisonous Pings.*

Again, it bears repeating that Agent Smith and his team were only able to identify the Ford F-150 based on the unlawful pings of phone 3145. (*See* Transcript at 15–16.) And, importantly

here, Agent Smith "relayed" to the Utah County deputies the information "Deputy Hurst had relayed to" him—"that it was possibly a white F-150 with California plates with dark taillight covers, and that was the only vehicle that stood out when Deputy Hurst had made his attempt for us." (Transcript at 20.) Thus, the traffic violation would not—and could not—have been made but for the information discovered as a result of the unlawful pings.

ii.    *The Traffic Violation Was Unlawfully Extended.*

As explained below, the traffic violation was unlawfully extended. The discovery of the drugs in the vehicle was therefore not based on an independent, valid means of discovery.

## II.    <u>There Was Not Reasonable Suspicion to Pull the Ford-150 Over Based On the Drug Investigation.</u>

As discussed above, all evidence in this case must be suppressed because it is fruit of the poisonous pings. But if that argument fails, Mr. Perez-Espinoza nevertheless prevails because the officers lacked reasonable suspicion to pull over the Ford F-150 based on the drug investigation.

"'Officers with reasonable suspicion to believe that the occupants of a vehicle are engaged in the unlawful transportation of contraband may detain the vehicle for a reasonable time to obtain a properly trained dog to sniff for contraband.'" *United States v. Orozco-Rivas*, 810 F. App'x 660, 665 (10th Cir. 2020). Reasonable suspicion cannot be based on a mere hunch. *United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022).

Here, the record evidence demonstrates that there was not reasonable suspicion that the Ford F-150 would contain contraband. As Agent Smith testified, no report produced in this case indicates that the purpose of the August 3, 2021, trip was to pick up drugs. (Transcript at 30.) Further, the Ford F-150 was not observed during the controlled buy—the Honda Ridgeline was. Further, the Ford F-150 was never observed at the residence in Lehi. (Transcript at 26.) The only record evidence linking the Ford F-150 to the unlawful transportation of contraband was Officer

19

Hurst's subjective belief that the Ford F-150 "was suspicious in appearance." (Transcript at 15.) But the Government has offered no evidence of why Officer Hurst believed the vehicle was suspicious. Officer Hurst's belief that the vehicle was "suspicious in appearance"—even in connection with the *possibility* that the occupants of that vehicle were in possession of phone 3145—amounts to a mere hunch.

There was no reasonable suspicion to pull the Ford F-150 over based on the drug investigation.

### III.    <u>The Deputies Unlawfully Extended the Traffic Stop.</u>

As discussed above, all evidence in this case must be suppressed because it is fruit of the poisonous pings. But if that argument fails, Mr. Perez-Espinoza nevertheless prevails because the deputies unlawfully extended the traffic stop.

Here, Sergeant King agreed that "the reason for the stop [was] the traffic violation." (Transcript at 47.) "Because a traffic stop is a seizure for constitutional purposes, it is subject to the Fourth Amendment's reasonableness standard." *United States v. Frazier*, 30 F.4th 1165, 1172–73 (10th Cir. 2022). "To be reasonable, a traffic stop must be justified at its inception and the officer's actions must be 'reasonably related in scope' to the 'mission of the stop.'" *Id*. at 1173. "In *Rodriguez v. United States* . . . the Supreme Court explained that an officer's authority to seize the occupants of a vehicle ends when 'tasks tied to the traffic infraction are—or reasonably should have been—completed.'" "An officer may conduct certain unrelated inquiries during the stop, but he **may not do so in a way that prolongs it** absent the reasonable suspicion ordinarily required to detain an individual." *Id*. (bold added). *Id*.

"Under *Rodriguez*, therefore, an unlawful seizure occurs when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that

'prolongs' (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion." *Id*. "Even *de minimis* delays caused by unrelated inquiries violate the Fourth Amendment in the absence of reasonable suspicion." *Id*.

Here, Deputy Hutchings unlawfully extended the traffic stop. Sergeant King had no reason to dispute that Deputy Hutchings initiated the traffic stop at 10:21. (Transcript at 48.) And he had no reason to dispute that Deputy Hutchings ran all computer checks by 10:22:34. (Transcript at 49; *see also* RPT-CU911-01-00005.) Sergeant King also testified that it would not surprise him if Deputy Sorenson (the K9 officer) arrived at 10:26:51. (Transcript at 50.) Upon further review, it appears undersigned counsel made a mistake. The records produced in discovery indicate that Deputy Sorenson arrived at 10:27:39. (RPT-CU911-01-00003 (The call detail report indicates Unit 'IJ189' arrived at 10:27:39. Further, Deputy Sorensen's report indicates that this incident was reported at 10:27:39 08/03/21. (RPT-UCSO-01-00002.).

Thus, if, as Sergeant King testified, the reason for the traffic stop was the traffic violation, Deputy Hutchings unlawfully extended the stop because he prolonged the stop from 10:22:34—the time he completed the records check—until 10:27:39—the time Deputy Sorensen arrived. By the time the computer checks had been run, Deputy Hutchings should have either been issuing a ticket for the traffic violation or releasing the vehicle. Instead, he diverted from the traffic-based mission of the stop to wait for the K9 officer. This prolonged the traffic stop by approximately four minutes. This investigative detour was unsupported by any independent reasonable suspicion. The extension of the stop was unlawful.

### IV.  Mr. Perez-Espinoza's Statement Relating to Ownership of Phone 3145 Must Be Suppressed Under the Fifth Amendment.

"The Fifth Amendment to the U.S. Constitution guarantees that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" *United States v. Bowman*, 38 F.

21

Supp. 3d 1278, 1289 (D. Utah 2014). "Pursuant to the Supreme Court's holding in *Miranda v. Arizona,* 'a suspect's statements are generally inadmissible if law enforcement officers elicited them during a custodial interrogation without giving the prescribed warnings and obtaining a waiver." *Id*. at 1289–90 (citation omitted). "*Miranda* applies only to custodial interrogations." *Id*. at 1290. "Thus, *Miranda* rights need only be given to a suspect at the moment that suspect is in custody and the questioning meets the legal definition of interrogation."

Here, Agent Smith submitted an affidavit in support of an application under Rule 41 for a warrant to search and seize wherein here wrote: "After a drug-detecting canine altered to the front of the truck deputies **detained** both PEREZ and PENA." (SW-01-0002.03 (bold added).) After being detained, "[a]gents spoke to both PEREZ and PENA  . . . **as both were detained** while other agents searched the truck." (SW-01-0002.03 (bold added).) "Agents continued to search the truck and identified two cellular phone sitting in the center console cup holder together." (SW-01-0002.03.) One of the two phones had a red case. (RPT-DEA-01-00002.03.)

Later, "Agents transported the white F-150, PENA, and PEREZ to the DEA Office in Salt Lake City." (SW-01-0002.04.) Agent Smith testified that he transported "Pena, not Perez" to the D.E.A. office. (Transcript at 33.) He also testified that he spoke to both Perez and Pena "on scene at the traffic stop and again at" the DEA office. (Transcript at 33.) Agent Smith testified that Mr. Perez-Espinoza, pre-*Miranda*, at the traffic stop, admitted that the two phones in the console were his. (Transcript at 35.) But in one of his reports, Agent Smith wrote: "**Once at the DEA Office**, SA Smith asked PEREZ which cell phones from the truck were his, and PEREZ replied that both phones from the center console were his." (RPT-DEA-01-00002.03 (bold added).) Agent Smith wrote in a report that phone 3145 was the phone in the red case. Agent

Smith testified that Mr. Perez-Espinoza made the statement about denying ownership of the phone in the red case "post Miranda." (Transcript at 35.)

Here, Mr. Perez-Espinoza has met his burden to prove that the statement related to ownership of phone 3145 was obtained while under custodial interrogation. First, Mr. Perez-Espinoza was detained as soon as the canine alerted. He was unquestionably detained when agents began to ask questions of at the scene of the traffic stop. And he was detained after being transported to the DEA Office. Mr. Perez-Espinoza was in custody.

Agent Smith should have administered *Miranda* warnings to Mr. Perez-Espinoza prior asking him questions at the scene of the traffic stop. And he should have administered *Miranda* warnings at the DEA office prior to asking Mr. Perez-Espinoza about ownership of the phones.

All statements that Mr. Perez-Espinoza made pre-*Miranda*—including his statement about owning phone 3145—must be suppressed under the Fifth Amendment.

## CONCLUSION

For the reasons stated, the Court should suppress all evidence found in the vehicle and suppress any statements that Mr. Perez Espinoza made relating to this case because all evidence discovered is fruit of the unlawful pings of phone 3145.  But even if Mr. Perez-Espinoza's first argument fails, the evidence must be suppressed because there was not reasonable suspicion to pull Mr. Perez-Espinoza over based on the drug investigation and the deputies unlawfully extended the traffic stop.

Finally, even if all the prior arguments fail, (they do not) Mr. Perez-Espinoza respectfully requests that the Court suppress his statement that the phone belonged to him because that statement was made in violation of *Miranda*.

RESPECTFULLY SUBMITTED this 31st day of January, 2024.

*/s/ Nicolas C. Wilde*
Nicolas C. Wilde
*Attorney for Gabriel Alexis Perez-Espinoza*

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2024, I caused a true and correct copy of the

foregoing to be served via CM/ECF on the following:

Seth Nielsen
U.S. Attorney's Office
111 South Main Street
Suite 1800
Salt Lake City, Utah 84111
Phone: 801-524-5682
Email: Seth.nielsen@usdoj.gov

Kelsy B. Young
U.S. Attorney's Office
111 South Main Street
Suite 1800
Salt Lake City, Utah 84111
Phone: 801-524-5682
Email: kelsy.young@usdoj.gov

*/s/ Nicolas C. Wilde*
Nicolas C. Wilde
*Attorney for Gabriel Alexis Perez-Espinoza*