1              IN THE UNITED STATES DISTRICT COURT

2                       DISTRICT OF UTAH

3                       CENTRAL DIVISION

4

5    UNITED STATES OF AMERICA,          )

6              Plaintiff,               )

7    vs.                                )   Case No. 2:21-CR-361TS

8    GABRIEL ALEXIS PEREZ-ESPINOZA,     )

9              Defendant.               )

10   _____)

11

12

                 BEFORE THE HONORABLE TED STEWART
13               --------------------------------

14                     January 9, 2024

15

16                     Motion to Suppress

17

18

19

20

21

22

23

24

25

1

2                          A P P E A R A N C E S

3

4

5   For Plaintiff:                SETH A. NIELSEN
                                  5272 College Drive
                                  Suite 300
6                                 Murray, Utah

7                                 STEWART M. YOUNG
                                  111 South Main Street
8                                 Suite 1800
                                  Salt Lake City, Utah

9

10

11

12

13  For Defendant:                NICOLAS CASTANUELA WILDE
                                  32 West 200 South
                                  PMB #123
14                                Salt Lake City, Utah

15

16

17

18

19

20

21  Court Reporter:               Ed Young
                                  351 South West Temple
                                  Room 3.302
22                                Salt Lake City, Utah 84101-2180
                                  801-328-3202
23                                ed_young@utd.uscourts.gov

24

25

```
                        I N D E X

Witness                  Examination By              Page
-------                  --------------              ----

Enoch Smith              Mr. Nielsen (Direct)           6

Enoch Smith              Mr. Wilde (Cross)             22

Corey King               Mr. Nielsen (Direct)          36

Corey King               Mr. Wilde (Cross)             45

Corey King               Mr. Nielsen (Redirect)        51

Enoch Smith              Mr. Wilde (Recross)           52
```

```
Exhibit                                          Received
-------                                          --------

Defendant's Exhibit 2                                  28

Defendant's Exhibit 3                                  28

Plaintiff's Exhibits 1 and 2                           44

Defendant's Exhibit 1                                  53
```

```
 1   January 9, 2024                              10:00 a.m.
 2                    P R O C E E D I N G S
 3
 4        THE COURT:  Good morning, counsel.
 5        We're here in the case of United States of America
 6   versus Gabriel Alexis Perez-Espinoza, case 21-CR-361.
 7   Representing the United States we have Mr. Stewart Young and
 8   Mr. Seth Nielsen.  On behalf of the defendant, Mr. Nicolas
 9   Wilde.  We are assisted by Mr. Nikolaj Widenmann as the
10   interpreter.
11        This motion to suppress was originally filed back
12   in October of 2022 by the defendant's previous counsel.  A
13   hearing to hear the motion was delayed repeatedly so we're
14   finally here.
15        The Court would like to first ask Mr. Wilde
16   whether or not you wish to make any type of an opening
17   statement or do you want to go directly to the government's
18   witnesses?
19        MR. WILDE:  Your Honor, I think I would like to go
20   directly to the government's witness and I would
21   respectfully request to invoke the rule, the witness rule.
22        THE COURT:  To exclude the witnesses?
23        MR. WILDE:  Yes, Your Honor.
24        THE COURT:  You have two witnesses, correct?
25        MR. NIELSEN:  Yes, Your Honor.
```

```
 1              THE COURT:  Let's have the first one remain, but
 2    the second one, if he would please excuse himself and wait
 3    until he is called.
 4              MR. NIELSEN:  Yes, Your Honor.
 5              THE COURT:  Thank you, Mr. Wilde.
 6              MR. WILDE:  Thank you.
 7              MR. NIELSEN:  Your Honor, just for my
 8    understanding before we call Agent Smith to the stand, I
 9    wanted to make sure that this is just a motion to suppress
10    the reasonable suspicion for the stop of the vehicle.
11              THE COURT:  Mr. Wilde, is that your intent?
12              MR. WILDE:  That was the motion filed by the
13    previous attorney.  As the Court is aware, the government
14    did produce a document after we filed the motion and my
15    memorandum will depend on the government's justification for
16    the stop.
17              THE COURT:  So it sounds like the answer is yes.
18              MR. NIELSEN:  Okay.
19              The government would call Agent Enoch Smith.
20              THE COURT:  Enoch Smith.
21              Agent Smith, if you would come forward and be
22    sworn, please.
23                            ENOCH SMITH
24              Having been duly sworn, was examined
25                      and testified as follows:
```

1          THE WITNESS:  Enoch Smith.  First name is

2    E-n-o-c-h, last name Smith, common spelling.

3          THE COURT:  Go ahead, Mr. Nielsen.

4          MR. NIELSEN:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6    BY MR. NIELSEN

7    Q.    Agent Smith, where do you work?

8    A.    The Salt Lake City Drug Enforcement Administration.

9    Q.    How long have you worked there?

10   A.    For the D.E.A. nearly ten years.

11   Q.    Has that always been as a special agent?

12   A.    Ten years as a special agent and another ten as a

13   border patrol agent.

14   Q.    Was that prior to you being with the D.E.A.?

15   A.    Yes, sir.

16   Q.    Do you mind talking about any special training or

17   experience that you have?

18   A.    On the border patrol I worked at checkpoint immigration

19   and drug interdiction on major interstates leaving the

20   border areas around El Paso, Texas.

21          With the Drug Enforcement Administration light duties

22   on the border, and then in 2018 I moved to Salt Lake City

23   where I focused primarily on wiretaps, highway interdiction

24   resulting from wiretap information and specifically Title 21

25   enforcement.

1    Q.   So you have been here in Salt Lake doing drug
2    enforcement since 2018?
3    A.   Yes, sir.
4    Q.   Are you familiar with the reports and investigation
5    leading up to the arrest of Gabriel Perez-Espinoza?
6    A.   I am.
7    Q.   I would like to get to some specific dates, but can you
8    give us some background on that investigation?
9    A.   Sure.  My involvement began around 2019, early 2019.
10   We began an investigation into Sinaloa cartel members, both
11   in Utah, Southern California and Sinaloa, Mexico, and their
12   involvement in drug distribution in Salt Lake City
13   specifically, often at the direction of cartel heads in
14   Sinaloa.
15   Q.   Is that your experience that these Sinaloa cartels
16   operate in this manner?
17   A.   Yes.  For the wholesale drug distribution of the
18   various types of drugs in the Salt Lake Valley, in my
19   experience Sinaloa really runs the show and that typically
20   their method of operation is local distribution sale working
21   in concert with a boss or some sort of source of supply out
22   of Sinaloa, Mexico.
23   Q.   So the local distribution group is here in Salt Lake,
24   but then the boss was either in -- I think you said Sinaloa,
25   Mexico or California.

1          Is that fair to say?

2   A.    Yes, sir.

3   Q.    Now, is that your experience with this group that you

4   began investigating in 2018?

5   A.    Yes.

6   Q.    Who was the boss that you began investigating?

7   A.    We identified the boss or at least the point of contact

8   for the local distribution sale here as a Sinaloa based

9   target by the name of Pedro Meza.

10  Q.    Let's focus on some specific dates now.

11        Let's talk about July 26, 2021.  What happened on that

12  day?

13  A.    On that day we received information from a confidential

14  source that the source had been in touch with Pedro Meza and

15  Pedro Meza had provided a phone number, I believe 739-3145,

16  as the Utah based point of contact to obtain drugs.

17  Q.    Let's slow down just a little bit.

18        What can you tell me about the reliability of this

19  C.S.?

20  A.    My involvement with this confidential source began

21  about late 2020 and the source was reliable, trustworthy and

22  provided actionable real-time information specifically on

23  Sinaloa cartel members.

24  Q.    This C.S. is known to you?  It is not anonymous?

25  A.    Correct.  Yes.  Known to me, yes.

1    Q.    Okay.  Let's go back to this phone number.  Can we just

2    call it 3145?

3    A.    3145.

4    Q.    I think you testified that the C.S. had been in contact

5    with Meza Roman and Meza Roman provided 3145 to the C.S. as

6    a point of contact?

7    A.    Correct.

8    Q.    Did he describe any further the point of contact?  Did

9    he say it was a point of contact to provide quantities of

10   drugs?

11   A.    Yes.  In our experience when we receive this

12   information directly from Sinaloa it is typically for

13   wholesale drug amounts.  For example, they won't break a

14   pound of meth typically if they don't have to.  They prefer

15   to sell it in bulk.  So at our direction the informant

16   placed a call to the subject using 3145, spoke to this

17   subject, and at our direction asked for pound quantities of

18   methamphetamine and the pricing for those pounds.

19   Q.    So the C.S. contacted 3145 and discussed with that

20   person the user of 3145 about purchasing pound quantities of

21   methamphetamine?

22   A.    That is correct.

23   Q.    Was a meeting ever established?

24   A.    Later at our direction we asked for a meeting,

25   obviously, for a controlled purchase.  This was done again

1    at our direction with the anticipation that we would

2    purchase a pound of methamphetamine at the asking price of

3    2,500.

4    Q.   As part of this investigation did you ever apply for a

5    ping warrant?

6    A.   Yes.  Based on this information from the informant,

7    T.F.O. Johnny Ngo obtained a state G.P.S. location order for

8    3145 on July 29th, 2021.

9    Q.   Did that get authorized?

10   A.   It did.

11   Q.   At approximately what time did that get authorized?

12   A.   9:45 a.m., I believe.

13   Q.   Was it 9:45 or was it 9:30?

14   A.   9:30-ish a.m.

15   Q.   That morning it is fair to say?

16   A.   Yes, sir.

17   Q.   Did agents begin receiving ping intercept data?

18   A.   Yes, later that afternoon.

19   Q.   What did agents see when they began receiving that

20   information?

21   A.   Location data for 3145 indicated that the phone -- the

22   device was in California.

23   Q.   Is that the first time you knew that 3145 wasn't in the

24   State of Utah?

25   A.   Yes.

1    Q.    What did you do when you saw that 3145 was not in the

2    State of Utah?

3    A.    We proceeded with the attempt at a controlled purchase

4    and at our direction, the informant placed a phone call to

5    3145 to line up the details for a controlled purchase later

6    that day.  In ironing out the details of the location, cost,

7    purchase amount, as we asked, 3145 relayed to the informant

8    that the user of 3145 was out of the state and he would have

9    to send his co-worker, because he was out of state to obtain

10   more drugs and they were almost out.  So all that they could

11   provide to us was ten ounces instead to the previously

12   agreed to pound.

13   Q.    So when the C.S. contacted 3145 to set up the deal,

14   that is when the user of 3145 said the user of 3145 was out

15   of state in California picking up additional drugs.

16        Is that fair to say?

17   A.    Correct.  Yes, sir.

18   Q.    But that he would send a partner or a co-worker to the

19   deal?

20   A.    Correct.

21   Q.    Did that deal take place?

22   A.    It did.

23   Q.    When and where did that take place?

24   A.    The Fashion Place Mall later in the afternoon on the

25   29th.  At about 4:30 in the afternoon we established our

1    meeting with the confidential source to conduct our typical

2    protocol for a controlled purchase meeting with the

3    informant, searching the informant for any possible

4    contraband or other currency to eliminate any variables.  We

5    established pre-surveillance as soon as we received the

6    location, which we didn't get until we were on scene.  The

7    user of 3145 contacted the informant and told him that the

8    user of 3145 was a male, Spanish speaking male, and told the

9    source to go to the Olive Garden area of Fashion Place Mall.

10   Q.   So did agents and the C.S. respond to the Fashion Place

11   Mall?

12   A.   We did.  The user of 3145 told the informant to look

13   for a green truck, that his friend, the supplier of the ten

14   ounces would be in a green truck at the Olive Garden area.

15   So we established surveillance there and sent our informant

16   into the parking lot area at the Olive Garden and we did not

17   see a green truck.

18       Instead, we observed a silver Honda Ridgeline parked

19   near the informant's vehicle and they motioned for the

20   informant to follow the subjects in the silver Ridgeline.

21   Q.   Did the C.S. follow the Honda Ridgeline?

22   A.   The informant followed the Ridgeline to a different

23   area of the parking lot, the southeast corner of Fashion

24   Place in the parking lot area.  There we observed a Hispanic

25   male exit the Ridgeline, board the informant's vehicle, and

1    there they conducted the controlled purchase of ten ounces.

2    Q.    That is a term of art, controlled purchase.  We

3    generally talk about it, but that is the type of purchase

4    that the D.E.A. is controlling the variables and conducting

5    the surveillance.

6        Is that fair to stay?

7    A.    Yes, sir.

8    Q.    Okay.  What happened after there was the exchange of

9    money for drugs from the individual from the Honda

10    Ridgeline?

11    A.    So we typically follow the informant away and obtain

12    the drugs that we purchased and then conduct post operation

13    surveillance of the subject who brought the narcotics.  We

14    did this at this time for at least an hour if I remember

15    correctly.

16        At this time the driver of the Honda Ridgeline

17    conducted various abrupt and odd traffic maneuvers in an

18    attempt, in my opinion, to identify anyone following that

19    subject.  It was a Hispanic male.  The driver would take

20    abrupt turns, drive through neighborhoods with no apparent

21    direction, and seemed to drive around aimlessly in what we

22    call heat runs, park curbside and just sit and things such

23    as this, and it made surveillance very difficult, indicative

24    of really professional grade drug traffickers in my opinion.

25    Q.    That is the point to try and avoid surveillance.

1        Is that fair to say?

2   A.   Correct.

3   Q.   You mentioned that 3145, the user of 3145 had told the

4   C.S. to look for a green truck.  What is the significance of

5   that based off your training and experience?

6   A.   I believe that was intentional to throw off law

7   enforcement as this was our first meeting in quite a while

8   with this group under Pedro Meza's direction.  I believe

9   this was intentional to flesh out any surveillance and was a

10  countersurveillance attempt for the traffickers to identify

11  the informant vehicle first and try to identify any agent

12  surveillance such as circling the parking lot and our

13  attempts to locate this phantom green truck.

14  Q.   Have you had that experience actually happen to you

15  during your career?

16  A.   I have.  I have had that exact thing happen to me on

17  other operations, yes.

18  Q.   So just like the heat runs, is that indicative of a

19  sophisticated drug trafficking network?

20  A.   Yes.

21  Q.   Let's go to July 31st.  What happened on July 31st,

22  2021?

23  A.   On July 31st we identified that the device that we have

24  the G.P.S. location order for, 3145, had returned to Utah.

25  It was traveling up I-15 from the St. George area.  We made

1    an interdiction attempt knowing based on our information

2    provided by 3145 through the informant that he was likely

3    returning with drugs.  We made an attempt at locating the

4    vehicle, and at the time it was unidentified, based on the

5    location of 3145.

6    Q.   So 3145 was back in Utah and it was moving northbound

7    through Utah?

8    A.   Correct, on I-15.

9    Q.   You were attempting to interdict or at least learn more

10   about 3145.

11       Is that fair to say?

12   A.   Yes, sir.

13   Q.   Did you make contact with an Officer Hurst of Juab

14   County?

15   A.   I did.

16   Q.   What happened then?

17   A.   So basically, not knowing what vehicle we may be

18   looking for, it was as much an intel surveillance gathering

19   as an interdiction attempt.  So Officer Hurst established

20   surveillance on I-15 observing northbound traffic and

21   relayed to me that the only vehicle that he observed that

22   was suspicious in appearance was a white Ford F-150 with

23   California plates and it had very dark taillight covers.

24       This fit the location of the device, 3145, as it was

25   traveling northbound on I-15.  He followed it for a time and

1    could not establish a reason for a stop.

2    Q.    Did he stop it that day?

3    A.    He did not.

4    Q.    But he relayed that description to you?

5    A.    He did.

6    Q.    What else happened that day with Task Force Officer

7    Johnny Ngo?

8    A.    After 3145 came into the Salt Lake Valley we observed

9    that it stopped in Lehi.  T.F.O. Ngo traveled to the area

10   and in driving around the neighborhood, he observed the same

11   Honda Ridgeline we had done the controlled purchase out of

12   and done the surveillance of previously and was parked at

13   642 Lakeview.  This was in the general area of the location

14   for 3145 as it was stationery.

15   Q.    So the Ridgeline that they had done the deal with

16   previously was parked at least in the area of the ping

17   location data for 3145?

18   A.    Correct.  He did not see the F-150, but there was a

19   large two-car garage at the residence that we believed the

20   truck could have been parked inside of.

21   Q.    What is the significance of the garage versus the

22   Ridgeline being outside?

23   A.    In my experience specifically this group of Sinaloa

24   cartel members typically have sometimes even a fleet of

25   vehicles at their disposal.  Typically they have a very good

1   false compartment that is used in a vehicle often with

2   California plates for interstate travel for bulk shipments

3   of drugs and currency.  Typically this is not the vehicle

4   they use locally for distribution.  They do their own

5   driving often and the same subjects who will retrieve the

6   drugs are the ones in charge of the distribution upon

7   arrival.

8        They will typically conceal these interstate vehicles

9   with the false compartment inside a garage and make them

10  inaccessible and they don't drive around these vehicles

11  daily.  They typically have a different vehicle with local

12  license plates for their distribution in Utah.

13  Q.   So the use of the Ridgeline in your experience and the

14  use of the Ford 150 would match your training and experience

15  here in Salt Lake City?

16  A.   100 percent.

17  Q.   So on August 1st did you notice anything about 3145?

18  A.   Yes.  The device again departed the State of Utah and

19  headed south towards California.

20  Q.   After it exited the State of Utah, what did you do?

21  A.   We typically conduct spot-checks.  This is a review

22  every six hours or so of the G.P.S. location, which comes in

23  to our emails from the service provider, in this case AT&T.

24  This is an attempt to not determine where in California the

25  subject is, other than to identify any reentry into the

1  State of Utah.

2      For example, if it takes five hours to drive from

3  Riverside, California to St. George, we typically check

4  about that often to determine if the device has reentered

5  our state if it is a state ping.

6  Q.    On August 3rd after it exited the State of Utah, did

7  you do some spot-checking?

8  A.    I did.  On August 3rd early in the morning one of the

9  first things I did was check the location data for this

10  particular device, 3145, and it had already entered the

11  State of Utah, near Kanab I believe.

12  Q.    So early in the morning of August 3rd 3145 was back in

13  the State of Utah?

14  A.    Yes.

15  Q.    What did you do?

16  A.    After some discussion with the case agents we made the

17  decision to again try to interdict this vehicle and make a

18  stop to locate drugs if they were concealed in the vehicle.

19  Again, we were not sure of the vehicle.  The only possible

20  vehicle description that we had was the white truck which

21  was relayed to us from Deputy Hurst from Juab County.

22      After identifying the route, which was highly

23  unusual --

24  Q.    Slow down a little bit.  Let's talk about the route

25  that you were observing 3145 take.  Go ahead and describe

1    that.

2    A.    So the route, the most direct route say from Kanab

3    would have been to jog over to I-15 and come up.  However,

4    in this case the location data for 3145 showed us that the

5    subject took a north and then northeasterly route up Highway

6    89 to I-70, and then east away from I-15 to Salina and then

7    up through the Richfield area.

8    Q.    So you were watching 3145 do this in real time?

9    A.    Yes.  Well, every 15 minutes.

10   Q.    Every 15 minutes.

11         What is the significant of this route based off of your

12   training and experience?

13   A.    This is also indictive of, for lack of a better term,

14   of professional wholesale drug traffickers who have a lot of

15   experience.  Typically interdiction efforts are heavier on

16   the major interstates, by local law enforcement especially.

17   Q.    Let me stop you.  I think interdiction may also be a

18   term of art.  Would you mind --

19   A.    Okay.  Interdiction would be typically like

20   interdiction efforts without prior information, our

21   surveillance, cold surveillance or work on the interstates

22   to identify possible drug vehicles.

23   Q.    By law enforcement?

24   A.    Yes.

25   Q.    Go ahead and keep going.

1    A.    In this case any interdiction efforts would be at our

2    direction and we had provided as much information as we had

3    to make this stop with the hopes that we could locate the

4    device, 3145, and whoever had that phone was bringing drugs

5    back from California.

6    Q.    So you were watching 3145.  What did you do?  Did you

7    head down south to try and intercept it yourself?  What did

8    you do?

9    A.    Not immediately, but the first thing we did -- I did

10   was contact as many local law enforcement officers as we had

11   in our phone and try to line up anyone who could respond to

12   the area of the location for 3145 as it continued north.

13        The first phone calls were to the Utah Highway Patrol,

14   because they typically have more personnel out on major

15   highways.  This was eventually relayed to -- as we saw that

16   3145 continued north towards Spanish Fork, the details were

17   relayed to Utah County deputies.  The details were what

18   Deputy Hurst had relayed to me, that it was possibly a white

19   F-150 with California plates with dark taillight covers, and

20   that that was the only vehicle that stood out when Deputy

21   Hurst had made his attempt for us.

22   Q.    You're contacting the highway patrol and you also got

23   ahold of the Utah County Sheriff's Office and you relayed

24   the previous description that we have been talking about.

25        Is that fair to say?

1    A.    Yes.

2    Q.    Did you relay that it was a possible load truck and

3    that you wanted it pulled over?

4    A.    Yes.  I relayed basically to try to attempt at a moving

5    violation or traffic violation, but that the reason behind

6    the request was it was a drug load and the possible vehicle

7    description.

8    Q.    So you sent that description out to whoever you could

9    reach.  Did you get information back after a period of time?

10   A.    Yes.  I received a phone call from one of the deputies

11   with Utah County that one of their deputies had seen the

12   truck that fit the description I had provided and that they

13   were going to try to get a stop on it.

14   Q.    Did they ever tell you if they made a stop on it?

15   A.    Yes, they did.  They told me that they had pulled the

16   truck over on Highway 6 in Spanish Fork Canyon and gave me

17   the mile marker and I headed that way myself.

18   Q.    When you were headed that way and you knew that they

19   had performed the stop, what did you learn about 3145?

20   A.    So in observing the G.P.S. location for 3145, I knew we

21   had the right vehicle stopped because the location didn't

22   change after the truck was stopped.  The location for 3145

23   stayed there.  It did not continue.  I knew then before I

24   even arrived on scene that we had the right vehicle.

25   Q.    When you arrived on scene, what did you notice about

1    3145 and what did you see about the vehicle?

2    A.    So upon arrival I noticed right away that the truck fit

3    the description that Deputy Hurst had provided to me from

4    his surveillance attempt on I-15.  I observed two subjects

5    being detained by the deputies.  They advised me that they

6    had already received a positive drug detect K-9 alert.

7    Q.    I am actually going to stop you there.  I just want to

8    talk about briefly what you saw about the location of 3145

9    and we'll stop there.

10   A.    Okay.  Long story short, the location data for 3145

11   stayed there at the scene of the stop and did not continue.

12   I later identified that one of the phones inside of the

13   truck was the 3145 device.  When I departed with that phone

14   in my possession the location data obviously followed me.

15          MR. NIELSEN:  Judge, if I could just have one

16   second?

17          THE COURT:  Go ahead.

18          MR. NIELSEN:  No further questions, Your Honor.

19          THE COURT:  Go ahead, Mr. Wilde, please.

20          Mr. Anderson, are you going to switch?

21          THE INTERPRETER:  Yes, Judge.  Thank you.

22          THE COURT:  Go ahead, Mr. Wilde.

23                         CROSS-EXAMINATION

24   BY MR. WILDE

25   Q.    Agent Smith, good morning.

1    A.   Good morning, sir.

2    Q.   Would you describe how you prepared for today's

3    testimony, please.

4    A.   How I prepared?

5    Q.   Yes, sir.

6    A.   Of course meeting with my prosecutor and a review of

7    prior reports.

8    Q.   Did you review your reports?

9    A.   I did, yes, sir.

10   Q.   You did not?

11   A.   No, I did.  Yes, sir.

12   Q.   Did you review the reports of the Utah County sheriff's

13   deputies?

14   A.   I believe I reviewed Sergeant King's and Hutchings and

15   Sorenson.  I believe those are the only three on scene, yes,

16   sir.

17   Q.   Did you review any affidavits in support of search

18   warrants?

19   A.   I reviewed the G.P.S. location warrant for 3145.

20   Q.   Did you review the warrant in support of the search of

21   the truck?

22   A.   I don't believe I read that one again.  I have read it

23   since, but not this week.

24   Q.   Thank you.

25        Are you familiar with the group of law enforcement

1   agents referred to as S-L-C-D-O Group Two?

2   A.   That is my group, yes, sir.

3   Q.   So you are a member of that group?

4   A.   I am, yes, sir.

5   Q.   Is Aaron Bjorndal a member of that group?

6   A.   He was at the time.

7   Q.   He was at the time.  Johnny Ngo?

8   A.   Johnny Ngo.  Yes, sir.

9   Q.   Johnny Ngo.  I apologize.

10  A.   They have both moved on to other endeavors, but at the

11  time they were in my group, yes, sir.

12  Q.   And that group investigated Meza Roman?

13  A.   We did, yes, sir.

14  Q.   And it was your group's understanding that in July of

15  2021 Meza Roman was in Southern California?

16  A.   Initially we received that information from an

17  informant, yes, sir.

18  Q.   And you testified that on or around July 29th your

19  group observed a controlled buy at the mall?

20  A.   Yes, sir.

21  Q.   Did you observe my client during that controlled buy?

22  A.   No, sir.

23  Q.   Did you observe Sebastian Aredondo?

24  A.   Not with any certainty, no, sir.

25  Q.   You did perform surveillance of that buy?

1   A.   Yes, sir, we did.

2   Q.   Did you take audio recordings or video recordings?

3   A.   An audio recording from inside of the vehicle only

4   during the actual hand-to-hand interaction.

5   Q.   Okay.  And it was on that same day that you received

6   information that the phone ending in 3145 was in California?

7   A.   Yes, sir.

8   Q.   Okay.  Was it on or around July 31st that Officer Hurst

9   or Deputy Hurst --

10  A.   He was a deputy at the time.  He is now an officer for

11  the Nephi City Police Department.

12  Q.   Deputy Hurst observed the Ford F-150?

13  A.   Yes, sir.

14  Q.   And you were in contact with Deputy Hurst?

15  A.   I was, yes, sir.

16  Q.   How did you contact him?

17  A.   By phone.

18  Q.   Just voice?

19  A.   Yes, sir.

20  Q.   And later that day Officer Ngo went to an address in

21  Lehi?

22  A.   Yes, sir.

23  Q.   That address was a residence?

24  A.   Yes, sir.

25  Q.   He was able to go to the residence based off the ping

1  warrant that the agents had obtained?

2  A.    Yes, sir.

3  Q.    Did you observe my client on that day outside of the

4  residence?

5  A.    No, sir.

6  Q.    Did you observe the Ford F-150 on that day outside of

7  the residence?

8  A.    We did not.

9  Q.    Did you observe Sebastian Aredondo?

10  A.    T.F.O. Ngo observed a Hispanic male that resembled

11  Sebastian in the driveway I believe.

12  Q.    I would like to turn briefly to the concept of ping

13  warrants.  Are you familiar with what a ping warrant is?

14  A.    Yes, sir.

15  Q.    Have you received training on the use of ping warrants?

16  A.    Official training -- other than academy training and

17  in-service.

18  Q.    But you can describe what they are?

19  A.    Yes, sir.

20  Q.    Can you describe the difference between a ping warrant

21  and a warrant for historical cell phone data?

22  A.    Yes, sir.

23  Q.    Please describe the difference.

24  A.    Typically historical is often more accurate than live

25  time.  Recently, especially with the new devices, G.P.S.

1    location data has been mediocre at best, the live data.

2    Typically historical G.P.S. location data can be more

3    accurate depending on the service provider and, of course,

4    it is not live time.  It is typically asked for in 30-day

5    increments by agents.

6        Those would be provided sometimes at the mercy of the

7    service provider when they provide these things, but

8    historically it would be in like 30-day chunks, whereas live

9    G.P.S. location pings, as they are called commonly, come in

10   to our email from the service provider every 15 minutes.

11   Q.   Is the ping created in the normal use of the phone or

12   does it require the affirmative action of the telephone

13   company?

14   A.   It requires compliance by the service provider.  It is

15   specific, so we serve the warrant on the provider of the

16   device.

17   Q.   Okay.  Thank you.

18       So you are familiar with the affidavit in support of

19   the ping warrant?

20   A.   Yes.

21   Q.   You didn't personally draft it, but a team member of

22   yours did draft it, correct?

23   A.   That is correct.

24   Q.   And that affidavit for the search warrant was submitted

25   on or around July 29, 2021?

```
 1   A.   Yes, sir.

 2            MR. WILDE:  Your Honor, I would move for the

 3   admission of that affidavit.

 4            THE COURT:  Do you have a copy for the Court?

 5            MR. WILDE:  I do, yes, Your Honor.  I have a copy

 6   for the United States as well.

 7            I introduce it as Defendant's Exhibit 2.

 8            THE COURT:  Any objection, Mr. Nielsen?

 9            MR. NIELSEN:  No, Your Honor.

10            THE COURT:  It will be admitted.

11            (Defendant's Exhibit 2 was

12             received into evidence.)

13   BY MR. WILDE

14   Q.   And you are familiar with the warrant as well?

15   A.   Yes, sir.

16            MR. WILDE:  Your Honor, I move for the admission

17   of that warrant as Defendant's Exhibit 3.

18            THE COURT:  Any objection?

19            MR. NIELSEN:  No, Your Honor.

20            THE COURT:  It will be admitted.

21            (Defendant's Exhibit 3 was

22             received into evidence.)

23   BY MR. WILDE

24   Q.   The D.E.A. did begin collecting the location data for

25   that phone on July 29, 2021, correct?
```

1    A.    Yes, sir.

2    Q.    And it stopped around August 3rd, 2021?

3    A.    Yes, sir.  I believe we turned it off after the

4    defendants were in custody.

5    Q.    And the location data was sent by AT&T to Officer Ngo?

6    A.    Correct.

7    Q.    And he forwarded you those emails, correct?

8    A.    Correct.

9    Q.    The location data for July 31st would have revealed

10    that the phone was in fact at a residence, correct?

11    A.    It was in a residential area.  It wasn't specific and

12    tight enough in accuracy to determine which residence, but

13    in a residential neighborhood, yes.

14    Q.    Thank you.

15          If I may, I would like to turn your attention to the

16    arrest that occurred on August 3rd.  Do any reports that

17    have been produced in this case indicate that the person in

18    possession of the phone ending in 3145 went to California

19    for the specific purpose of picking up drugs?

20    A.    It is in a report, yes.  It was relayed by 3145 to our

21    informant who relayed to us that that was the reason for the

22    travel.

23    Q.    For August 3rd or for a prior date?

24    A.    Prior date.  Prior trip.

25    Q.    Prior trip?

1    A.    The 31st, yes, sir.  Not specific to the 3rd.

2    Q.    Not specific to the 3rd?

3    A.    Correct.

4    Q.    Just to clarify, what is in the report is that at the

5    time that the ping warrant began for the location of the

6    phone was for that first trip out of state?

7    A.    That is correct.

8    Q.    Not for the second trip?

9    A.    Correct.

10   Q.    Thank you.

11         Nothing in the report indicates that the second trip's

12   purpose was to pick up drugs?

13   A.    That is correct.

14   Q.    And you had never personally identified my client prior

15   to the arrest on August 3rd?

16   A.    I actually arrested him in 2020 or 2019.

17   Q.    In connection with this investigation?

18   A.    No.

19   Q.    I would like to ask you -- so on the day of the arrest

20   you were in contact with deputies from which office?

21   A.    I'm sorry.  Can you repeat that?

22   Q.    On the date of August 3rd, the date that the truck was

23   pulled over --

24   A.    I spoke to numerous law enforcement officers in an

25   attempt to find basically any local law enforcement along

1  the route of travel.  So I spoke to U.H.P., the Highway

2  Patrol in Southern Utah, and I spoke to Deputy Hurst again

3  and one of his partners with Juab County, and I spoke to a

4  couple of the deputies in Utah County ultimately.

5  Q.  Including Sergeant King?

6  A.  Yes.

7  Q.  And Deputy Hutchings?

8  A.  And probably Sorenson as well.

9  Q.  How did you communicate with them?

10  A.  Over the phone.

11  Q.  By voice?

12  A.  Voice.  I was driving like to the area at the time.

13  Q.  You eventually did arrive on the scene?

14  A.  Yes, sir.

15  Q.  By the time you arrived they had already pulled the

16  vehicle over?

17  A.  That is correct.

18  Q.  Who was present by the time you arrived?

19  A.  Officer Hutchings or Deputy Hutchings, Sergeant King,

20  Deputy Sorenson and, of course, the two defendants.

21  Q.  Are you familiar with a deputy named Deputy Bishop?

22  A.  Not personally.

23  Q.  Do you know if he was present at the scene that day?

24  A.  I don't recall.

25  Q.  By the time you arrived had the deputies discovered

1    narcotics?

2    A.    They had not.

3    Q.    They had not.  But they had performed a K-9 search?

4    A.    Correct.

5    Q.    Do you know what time they initiated the traffic stop?

6    A.    I believe it was around 15 or 20 minutes before 11:00

7    a.m., 10:40 or 10:45 or so.

8    Q.    Would it surprise you if it was a little bit earlier

9    than that?

10    A.    No.

11    Q.    Did you speak to my client on that day?

12    A.    I did.

13    Q.    Did you speak to him at the scene of the traffic stop?

14    A.    I did.

15    Q.    In what language did you speak to him?

16    A.    Spanish.

17    Q.    Do you speak Spanish?

18    A.    Intermediate Spanish.

19    Q.    Okay.  When you spoke to him did you also transport him

20    to the office?

21    A.    I did.

22    Q.    Did you transport the co-passenger?

23    A.    I believe I only transported Perez.

24    Q.    Would it surprise you if you actually transported Pena

25    Aredondo?

1  A.   I would have to double-check.  I believe I only

2  transported one of the defendants.

3  Q.   Okay.

4        MR. WILDE:  Your Honor, may I just refresh his

5  memory very quickly?

6        THE COURT:  Yes.

7        MR. WILDE:  I apologize.

8        May I approach, Your Honor?

9        THE COURT:  You may.

10 BY MR. WILDE

11 Q.   Paragraph five --

12       THE COURT:  What is it you're showing him?

13       MR. WILDE:  It is a report that was authored in

14 August of 2021, Your Honor.

15       THE COURT:  Thank you.

16       THE WITNESS:  Okay.

17 BY MR. WILDE

18 Q.   Which one did you transport to the D.E.A. office?

19 A.   Pena, not Perez.  Sorry about that.

20 Q.   When you arrived did you speak to both of them?

21 A.   I did.  I spoke to both of them on scene at the traffic

22 stop and again at our office, yes.

23 Q.   What did they tell you?

24       MR. NIELSEN:  Your Honor, I object at this point.

25 The motion is to the stop and this has gone way beyond the

1    stop.  I don't mind the agent testifying to this, but I

2    don't know the relevance of this.

3              THE COURT:  Mr. Wilde?

4              MR. WILDE:  Your Honor, it goes to standing.

5              THE COURT:  Standing.  I will allow a limited

6    amount of additional questions.

7              MR. WILDE:  Thank you, Your Honor.

8              THE WITNESS:  Can you repeat your question,

9    please.

10   BY MR. WILDE

11   Q.   At the D.E.A. office what did my client tell you

12   according to your report?

13   A.   I spoke to Mr. Perez post Miranda and he acknowledged

14   his Miranda rights and agreed to speak with me.  Initially

15   he claimed that the two cell phones I found in the console

16   of the truck weren't his.

17             THE COURT:  Were or were not?

18             THE WITNESS:  Weren't his.

19             THE COURT:  Okay.

20             THE WITNESS:  However, after we discovered the

21   drugs and I confronted him with that information, he denied

22   ownership of one of the phones, in a red cover, I believe.

23             THE INTERPRETER:  A what?  I am sorry.

24             THE WITNESS:  A phone with a red case.

25   BY MR. WILDE

1    Q.   It is your testimony today that he made those

2    statements post Miranda?

3    A.   He made these statements about denying the phone post

4    Miranda.

5    Q.   But he made the statement about owning the phone prior

6    to Miranda?

7    A.   I believe that is the case.  I think he claimed the

8    phone ownership in the field prior to arrival at the office.

9    Q.   It is your belief that he is the owner of the phone?

10    A.   I believe he had control over the phone.  In my

11    experience a customer phone or a phone that is used purely

12    for drug trafficking will often be used by a subject in

13    concert with a personal phone.  They typically separate

14    them.  It is normal to have two.

15    Q.   Just to clarify, it is your testimony today that he

16    claimed ownership of the phone prior to being Mirandized?

17    A.   I would have to refresh my memory from reports to

18    clarify.

19    Q.   Didn't you just testify that it was your belief that he

20    made that statement prior to Miranda in the field?

21    A.   That is my recollection in small talk about whose phone

22    was whose.  The passenger had a phone in his pocket.  The

23    other two phones were in the console of the truck.  To the

24    best of my recollection, I asked Perez, the defendant, if

25    the remaining phones were his and he said yes.  This was on

```
 1   scene at the traffic stop location, yes.
 2   Q.   Okay.
 3            MR. WILDE:  No further questions, Your Honor.
 4            THE COURT:  Anything else, Mr. Nielsen?
 5            MR. NIELSEN:  No, Your Honor.  Thank you.
 6            THE COURT:  May this witness be excused then?
 7            MR. NIELSEN:  Yes, Your Honor.
 8            THE COURT:  Thank you.
 9            Can he stay in the courtroom?
10            MR. NIELSEN:  Yes.  We are going to ask that he be
11   designated as the case agent.
12            THE COURT:  All right.
13            MR. NIELSEN:  Your Honor, we call Sergeant King.
14                          COREY KING
15                 Having been sworn, was examined
16                   and testified as follows:
17            THE WITNESS:  Corey, C-o-r-e-y, King, K-i-n-g.
18                      DIRECT EXAMINATION
19   BY MR. NIELSEN
20   Q.   Sergeant King, before I get started, does that happen
21   to be your report that is in front of you?
22   A.   Yes, sir.
23            MR. NIELSEN:  Your Honor, permission to approach
24   so I can actually take that away from him?
25            THE COURT:  Yes.
```

1  BY MR. NIELSEN

2  Q.   If you need to refresh your memory you can get it back.

3  A.   All right.

4       MR. NIELSEN:  Thank you, Your Honor.

5  BY MR. NIELSEN

6  Q.   Sergeant King, where do you work?

7  A.   Utah County Sheriff's Office.

8  Q.   How long have you worked there?

9  A.   Roughly 26 years.

10  Q.   What is your current assignment?

11  A.   I am a patrol sergeant over what we call our recreation

12  team.  We are a proactive team that runs around and we are

13  not assigned normal daily calls.

14  Q.   How long have you been in this position?

15  A.   A little over a year.

16  Q.   What was your assignment back on August 3rd of 2021?

17  A.   I was a patrol sergeant over just a normal patrol team.

18  Q.   How long have you been a sergeant with Utah County?

19  A.   Roughly five years.

20  Q.   As a sergeant and also as a patrol officer, do you have

21  any special training and experience with regard to your job?

22  A.   Along with that I'm the commander over our SWAT team.

23  I have worked in detectives specifically in what we call the

24  major crimes task force where we investigated drug groups.

25  Q.   How long did you do that?

```
1   A.    I believe five years.

2   Q.    I would like to turn your attention to August 3rd of

3   2021.

4         Is that date familiar to you?

5   A.    Yes, sir.

6   Q.    Did you happen to perform a traffic stop in the late

7   morning of that day?

8   A.    Yes.

9   Q.    Can you talk about what led up to that traffic stop?

10  A.    I think we were just patrolling up Spanish Fork Canyon.

11  One of the guys assigned to my team said there is a

12  potential vehicle that is transporting narcotics.  It should

13  be coming up 89, which is one of the roads that runs through

14  our county.  I'm like, yeah, let's go see if we can find it.

15  Q.    Whoever was working for you that got this information,

16  did they say where they got this information from?

17  A.    I don't recall if they said specifically who or what.

18  Q.    So you don't know if it was from a different agency.

19  This coworker just said that there was a load vehicle coming

20  up?

21  A.    Initially that is what I recall, yeah.

22  Q.    But he did say it was coming up soon?

23  A.    I believe he said it should be coming up fairly soon.

24  I don't recall being told a specific time frame or anything

25  like that.
```

1  Q.   Did he say what kind of vehicle it was?

2  A.   All I recall him saying is that it was a truck and it

3  would be traveling on this road.

4  Q.   You remember a truck traveling on the road sometime

5  soon?

6  A.   Yes.

7  Q.   Could they have related more information to you but you

8  don't remember?

9  A.   Possibly.

10  Q.   Based off of what you were told, what did you do?

11  A.   I drove down SR-89 to an area where it is pretty decent

12  to sit and watch traffic, because I patrol the area a lot.

13  There is a church just off of 89 in the area of Bird's Eye,

14  a decent parking lot, easy in and out for the most part, and

15  it gives me a good view of vehicles headed north and

16  southbound.

17  Q.   Were you expecting this suspected vehicle to come from

18  one direction or the other?

19  A.   Yes.  Specifically it would have been headed

20  northbound.

21  Q.   After you set up in this parking lot, what did you see

22  or what drew your attention?

23  A.   Just watching traffic and a group of cars coming by and

24  I just happened to notice a truck that looked like it could

25  possibly be the vehicle we were informed of.  I noticed

1    initially it had what we call fogged out taillights.  I

2    decided to follow it and see if I could get a traffic stop.

3    Q.    What else did you notice about the vehicle?

4    A.    It had two occupants in the cab.

5    Q.    Did you notice anything about the occupants?

6    A.    Just that they were two males.

7    Q.    What kind of vehicle was it that you noticed?

8    A.    It was I believe a white Ford F-150.

9    Q.    Did you notice anything about its license plate?  Do

10    you remember that?

11    A.    I don't remember anything specifically about the

12    license plate.  I do believe they were from California.

13    Q.    Okay.  You noticed this vehicle and it passes your

14    location.  Then do you pull into traffic to follow it?

15    A.    Yes.  I tried to get behind the vehicle.  I ended up --

16    due to the amount of traffic at the time, there was two or

17    three vehicles in front of me that I recall.

18    Q.    So there are two or three vehicles between you and

19    this -- can we call it the white F-150?  Is that fair to

20    say?

21    A.    Yes.

22    Q.    So two to three vehicles between you and that vehicle.

23    Did you observe anything about the white F-150?

24    A.    Yes.  I noticed while I was following it it would -- so

25    SR-89 is a narrow two-lane road, one lane in each direction.

1    I noticed that the vehicle would drift off, cross the white

2    fog line to the right, and by more than a tire's width,

3    meaning that the whole tire was over the white line, and

4    then it would correct and drift back and come up and touch

5    the centerline.  It did this I want to say roughly three

6    times while I was following it.

7    Q.   Even though there are two to three cars between you,

8    you could still see that the white F-150 was doing this?

9    A.   Yes.

10   Q.   And the right tire went over the right line you said

11   three times?

12   A.   At least three times.

13   Q.   Is that a traffic violation?

14   A.   Yes, sir.

15   Q.   After you observed the white truck for a period of

16   time, what ended up happening?

17   A.   I tried to make a traffic stop on it due to the two

18   violations that I had noticed, meaning the fogged out

19   taillights and then the driving pattern, but due to the

20   recent flooding in the area at the time, there just wasn't a

21   safe space to try and pull two large trucks off the side of

22   the road.

23        Having the two vehicles in front of me, I couldn't push

24   them out of the way or off to the side to get up to the

25   vehicle due to the debris as well.

1  Q.   I don't think you mean actually pushing them.  I think

2  you mean turning on your lights --

3  A.   Turning my lights on and having them yield over to the

4  right.

5  Q.   Please go ahead and continue.

6  A.   I ended up following the vehicle and we ended up making

7  it to the junction of Highway 6 and 89.  Highway 6 is an

8  extremely busy road, and because I was two or three vehicles

9  behind them, I noticed the white F-150 make a left-hand turn

10  onto Highway 6 so it was headed westbound.  I had called out

11  to the other members of my crew that were working in the

12  area at the time and said, hey, I followed this vehicle.

13  These are the things I observed.  See if you can locate it

14  and make a traffic stop on them.

15  Q.   What happened after that?

16  A.   Once I was able to get up and make the left-hand turn

17  myself onto Highway 6, Deputy Hutchings, which is one of my

18  crew members, was able to locate the vehicle just as it

19  crossed what we call Billy's Mountain.  He was set up in the

20  area and he noticed the vehicle and got in behind it and was

21  able to initiate a traffic stop for the taillights.

22  Q.   So Deputy Hutchings performed a traffic stop on the

23  vehicle?

24  A.   Correct.

25  Q.   Did you arrive on scene?

1    A.    Pardon me?

2    Q.    Did you eventually arrive on scene?

3    A.    Yes, I did.

4    Q.    Was the vehicle that he had pulled over, was it the

5    same vehicle that you had seen previously?

6    A.    Yes, sir.

7              MR. NIELSEN:  Your Honor, permission to approach?

8              THE COURT:  Yes.

9              MR. NIELSEN:  Thank you.

10   BY MR. NIELSEN

11   Q.    You have before you two things.  What are those two

12   things?

13   A.    This would be the taillights to the white Ford F-150.

14   Q.    So there are two pictures?

15   A.    Yes, sir.

16   Q.    One is marked Government's Exhibit 1 and the other is

17   marked Government's Exhibit Number 2?

18   A.    Yes.

19   Q.    So there are pictures of taillights.  Do you recognize

20   those taillights?

21   A.    They seem to be the same ones on the white F-150 that

22   we made the traffic stop on.

23   Q.    What stands out to you in those pictures or what is the

24   significance of that?

25   A.    That they have been painted or blacked out.  If you

1    look on the first picture where the lights are not

2    illuminated, meaning someone is not on the brake pedal, they

3    are darker than what comes standard on a stock F-150.

4         On the second one you notice that someone is standing

5    on the brakes so they are illuminated, but they are not as

6    bright as they should be.

7    Q.    Is that representative of the taillights that you saw

8    on the white F-150 on the day in question?

9    A.    Yes, sir.

10             MR. NIELSEN:  We would move to admit Government's

11   1 and 2.

12             THE COURT:  Any objection?

13             MR. WILDE:  No objection, Your Honor.

14             THE COURT:  They will be admitted.

15             (Plaintiff's Exhibits 1 and 2

16              were received into evidence.)

17             MR. NIELSEN:  Thank you.

18             If I can have just a second?

19   BY MR. NIELSEN

20   Q.    Just to be clear, and I think you testified to this,

21   but Deputy Hutchings stopped the white F-150 because you

22   directed him to.

23         Is that right?

24   A.    I didn't actually direct him to stop it.  I said these

25   are the violations I have seen on this vehicle, so he could

1  have stopped it in lieu of me, but Deputy Hutchings said he

2  stopped it because he noticed the same violation with the

3  taillights that I did and initiated the traffic stop.

4  Q.   So he saw the taillights and you saw the moving

5  violations?

6  A.   Yes, sir.

7          MR. NIELSEN:  I have no further questions.

8          THE COURT:  Mr. Wilde?

9                    CROSS-EXAMINATION

10 BY MR. WILDE

11 Q.   Good morning.

12 A.   Good morning, sir.

13 Q.   At the time of this incident you were Sergeant King,

14 correct?

15 A.   Still am Sergeant King.

16 Q.   I just want to make sure before I address you.

17 A.   Yes.

18 Q.   Thank you for coming today.

19      I would like to start with the beginning of your

20 testimony.  Well, first, how did you prepare for today's

21 testimony?

22 A.   Usually I review my report.

23 Q.   Did you review your report today?

24 A.   Yes, sir.

25 Q.   Did you review Deputy Hutchings' report?

```
 1    A.    Not today, no.

 2    Q.    But you have reviewed it?

 3    A.    Yes.

 4    Q.    Did you review Deputy Sorenson's report?

 5    A.    No.

 6    Q.    I would like to begin just by asking very quickly about

 7    what you testified to here today, and that was that you were

 8    asked to look for this truck, correct?

 9    A.    Yes.

10    Q.    Do you remember who asked you?

11    A.    Deputy Sorenson informed us of the vehicle.  I'm not

12    sure who asked him.

13    Q.    Okay.  But it is your understanding that Deputy

14    Sorenson had been in contact with someone who had asked him

15    to look for the vehicle?

16    A.    Yes.

17    Q.    Did you put that in your report?

18    A.    No.

19    Q.    Why didn't you put that in your report?

20    A.    Didn't feel that it was important to put it in my

21    report.

22    Q.    Sergeant King, are you familiar with the concept of a

23    wall stop?

24    A.    I am, sir.

25    Q.    Is that why you didn't put it in your report?
```

1    A.    Possibly, yes.

2    Q.    Just for the record, please explain what a wall stop

3    is.

4    A.    A wall stop is where an agency has information on

5    something, typically a vehicle, and they give us limited

6    information and ask us to go locate the vehicle and make a

7    traffic stop on it.

8    Q.    Okay.  And you testified earlier that you did review

9    Deputy Hutchings' report before your testimony here today?

10   A.    Yes.

11   Q.    Do you recall the reason that he put in his report for

12   calling the D.E.A.?

13   A.    Do I recall why he called the D.E.A.?

14   Q.    Why the D.E.A. was called to the stop.

15   A.    To help further search the vehicle.

16   Q.    And he didn't put in his report anything about the wall

17   stop, correct?

18   A.    No.

19   Q.    Was the reason for the stop the traffic violation?

20   A.    Yes.

21   Q.    Okay.  Now, if I may, I would like to just go through

22   the time line of the traffic stop.  Could you please explain

23   for the Court just how your computers work and how they

24   create a record of when information is inputted into the

25   computer such as arrival codes or all good codes and stuff

1    like that?

2    A.    We use a program called Spillman.  It is a computer

3    aided dispatch type system, so when we call something out on

4    the radio a dispatcher back at base enters in the time that

5    we called the traffic stop out or whatever information that

6    we put out, over the radio typically.  It all depends on the

7    individual dispatcher as to how fast that information is

8    entered and what information is entered and stuff like that.

9    Q.    And that information is stored and it is discoverable?

10   A.    Yes.

11   Q.    Okay.  So through that information would it surprise

12   you if the traffic stop was initiated at or about 10:21?

13   A.    No, that wouldn't surprise me.

14   Q.    You have no reason to dispute that?

15   A.    No.

16   Q.    Do you know the vehicle number I-J-1-2-2, and do you

17   have any reason to dispute that that corresponds with Deputy

18   Hutchings --

19   A.    1-J-1-2-2?

20   Q.    1-J-1-2-2, yes, sir.

21   A.    That would be Deputy Hutchings' call number at the

22   time.

23   Q.    His call number at the time?

24   A.    Yes.

25   Q.    So it wouldn't surprise you if Deputy Hutchings

1    initiated the traffic stop at 10:21?

2    A.    No.

3    Q.    Would it surprise you if Deputy Hutchings arrived at

4    the scene at 10:21 -- I apologize.  Let me move on.

5         Would it surprise you if he entered the name

6    corresponding with the driver's license -- he inputted that

7    into the system at 10:22:33?

8    A.    Okay.  Yes.

9    Q.    And that he ran the name at 10:22:33.  Would that

10   surprise you?

11   A.    No.

12   Q.    And that he entered a driver's license check at

13   10:22:34?

14   A.    No.

15   Q.    Would it surprise you that at this point all the

16   computer checks had been run by Deputy Hutchings?

17   A.    Does that surprise me, no.

18   Q.    Okay.  You testified that Deputy Sorenson arrived on

19   that day?

20            MR. NIELSEN:  I object, relevance.

21            MR. WILDE:  It goes to the extension of the stop,

22   Your Honor.

23            THE COURT:  The extension of the stop?

24            MR. WILDE:  For the purposes of a traffic

25   violation, yes.  I am putting in the record the time line.

```
1              THE COURT:  I will allow it.

2              MR. WILDE:  Thank you, Your Honor.

3    BY MR. WILDE

4    Q.    You testified that Deputy Sorenson arrived at the scene

5    after Deputy Hutchings, correct?

6    A.    Correct.  Deputy Sorenson arrived after the traffic

7    stop was initiated.

8    Q.    Okay.  Would it surprise you if he arrived at 10:26 and

9    51 seconds?

10   A.    No.

11   Q.    So the ping at 10:22:34 and 10:56:51, do you know if a

12   traffic ticket was issued?

13   A.    I don't know if he issued a citation or not, no.

14   Q.    To your knowledge was any ticket issued on this day?

15   A.    On that stop, not that I'm aware of.

16   Q.    Did you arrive about 10:27 and 27 seconds?  Would it

17   surprise you if you arrived at that time?

18   A.    No.  I arrived pretty quickly.

19              MR. WILDE:  Your Honor, I have no further

20   questions.

21              Well, I do.

22   BY MR. WILDE

23   Q.    Can you point specifically to the code violation that

24   you believe was violated with the brake light?

25   A.    I don't know the code off the top of my head, no.
```

```
 1            MR. WILDE:  I have no further questions for this
 2   witness.
 3            If I may I would like to just briefly re-call
 4   Agent Smith.  Very briefly, Your Honor.
 5            THE COURT:  Okay.  First of all, do you have any
 6   cross -- excuse me, redirect for Sergeant King?
 7            MR. NIELSEN:  I do have a little redirect, not
 8   cross, yes.
 9            THE COURT:  Go ahead.
10                      REDIRECT EXAMINATION
11   BY MR. NIELSEN
12   Q.   Just to clarify, before your performed the traffic stop
13   and you saw the vehicle that ultimately was pulled over, you
14   were on the lookout for this vehicle.
15            Is that fair to say?
16   A.   Correct.
17   Q.   Because that vehicle had been communicated to you with
18   a description at least to Deputy Sorensen.
19            Is that correct?
20   A.   Correct.
21   Q.   So it wasn't just the traffic violations that caused
22   you to pull this vehicle over, it was also the information
23   that you were looking for that vehicle.
24            Is that fair to say?
25   A.   Correct.
```

```
1           MR. NIELSEN:  Thank you.

2           THE COURT:  Mr. Wilde, anything else?

3           MR. WILDE:  Nothing further, Your Honor.

4           THE COURT:  Okay.  Sergeant King, you may be

5    excused.  Thank you.

6           THE WITNESS:  Thank you.

7           THE COURT:  Mr. Smith, apparently Mr. Wilde has

8    some additional questions for you, so if you would take the

9    stand, please.

10                          ENOCH SMITH

11          Having been previously sworn, was examined

12                   and testified as follows:

13                     DIRECT EXAMINATION

14   BY MR. WILDE

15   Q.   Agent Smith, earlier you testified that Aaron Bjorndal

16   was a member of your team?

17   A.   Yes.

18   Q.   And you are familiar with the fact that he did apply

19   for a search warrant of the truck at issue?

20   A.   Yes.

21          MR. WILDE:  May I refresh his memory, Your Honor?

22          THE COURT:  Why don't you ask him --

23   BY MR. WILDE

24   Q.   Are you aware that he represented in that affidavit for

25   the search warrant that the troopers had conducted a traffic
```

1    stop for a moving violation for tinted taillights?

2    A.   Yes.

3    Q.   To your knowledge did he mention anything about the

4    investigation related to the drugs in that affidavit for the

5    search warrant?

6    A.   I don't recall verbatim what was in the probable cause

7    affidavit.

8    Q.   But you are familiar with the fact that he did submit

9    it?

10   A.   Yes, sir.

11           MR. WILDE:  Your Honor, I respectfully request to

12   move to admit that affidavit into evidence as Defendant's

13   Exhibit Number 1.

14           THE COURT:  Any objection?

15           MR. NIELSEN:  No objection.

16           THE COURT:  It will be admitted.

17           (Defendant's Exhibit 1 was

18            received into evidence.)

19           THE COURT:  Do you have a copy?

20           MR. WILDE:  I do.

21   Nothing further, Your Honor.

22           THE COURT:  Mr. Nielsen, do you have anything?

23           MR. NIELSEN:  No.

24           THE COURT:  Thank you.  You may step down.

25           Do you have any additional witnesses?

1          MR. NIELSEN:  No, Your Honor.

2          Mr. Wilde, do you have any witnesses?

3          MR. WILDE:  No, Your Honor.

4          THE COURT:  All right.

5          Mr. Wilde, if you have a transcript by the 16th of

6     January, can you get the Court a memorandum by the 31st of

7     January?

8          MR. WILDE:  I would be able to do that, yes, Your

9     Honor.

10          THE COURT:  Mr. Nielsen, if I give you, then,

11     until the 12th of February --

12          MR. NIELSEN:  Yes, Your Honor.

13          THE COURT:  All right.  Those will be the

14     deadlines then for the memoranda from counsel.

15          Is there anything else here today, counsel?

16          MR. WILDE:  There is, yes, Your Honor.

17          To clarify an issue, I do recognize that with

18     prior counsel the reason for the motion was based off

19     suspicion of the stop, and based on the testimony today and

20     the evidence that was produced after the motion was filed I

21     would like to expand the scope of my memorandum.

22          THE COURT:  You can.  You can do anything that you

23     think is relevant.  All right?

24          MR. WILDE:  I can or cannot?

25          THE COURT:  You can.

1          MR. WILDE:  Thank you, Your Honor.

2          THE COURT:  With nothing else then, counsel, we'll

3    be in recess.

4          (Proceedings concluded.)