IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GABRIEL ALEXIS PEREZ-ESPINOZA,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER GRANTING IN PART DEFENDANT'S MOTION TO SUPPRESS<br><br><br><br>Case No. 2:21-CR-361-TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendant Gabriel Alexis Perez-Espinoza's Motion to Suppress. For the reasons discussed below, the Court will grant the Motion in part.

## I. BACKGROUND

A three-count Indictment was filed against Defendant on September 9, 2021, for (Count 1) Possession of Methamphetamine with Intent to Distribute; (Count 2) Possession of Heroin with Intent to Distribute; and (Count 3) Reentry of a Previously Removed Alien.

Defendant filed a Motion to Suppress arguing that all evidence found in the vehicle he was driving and all statements elicited from him following a traffic stop should be suppressed because (1) the evidence discovered is the fruit of an unlawful ping warrant; (2) law enforcement agents did not have reasonable suspicion to initiate the traffic stop; and (3) law enforcement agents unlawfully extended the traffic stop. Defendant further argues that certain statements he

1

made to law enforcement officers be suppressed because they were made in violation of *Miranda*.[1]

The Court conducted an evidentiary hearing on Defendant's Motion on January 9, 2024, and a supplemental evidentiary hearing on March 20, 2024. The following testimony was presented at the hearings.

DEA Special Agent Enoch Smith testified that he became involved in an investigation looking into Sinaloa cartel members, based out of Sinaloa, Mexico, and their involvement in drug distribution in Salt Lake City. At some point, DEA agents identified Pedro Meza, who was based in Sinaloa, as "the boss or at least the point of contact for the local distribution" in Salt Lake.[2] On July 26, 2021, a confidential source (the "CS") notified DEA agents that Meza had given the CS the phone number of the "Utah based point of contact to obtain drugs."[3] The phone number ended in 3145. Agent Smith testified that he had been working with the CS since late 2020 and found the CS to be "reliable, [and] trustworthy" and they had provided "real-time information specifically on Sinaloa cartel members."[4]

At that point the CS called the 3145 number and inquired with the phone user about purchasing methamphetamine. DEA agents then directed the CS to set up a meeting with the 3145 phone user in order to facilitate a controlled purchase of one pound of methamphetamine in exchange for $2,500.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] Docket No. 101-1, at 8:7–8.

[3] *Id.* at 8:16.

[4] *Id.* at 8:20–23.

Based on the information provided by the CS, agents applied for a ping warrant to track phone 3145's location. The warrant was issued on July 29, 2021, and agents began receiving location data of the phone's location that afternoon from AT&T. The agents then learned that phone 3145 was not in Utah at that time. The CS placed another call to the 3145 phone to set up another controlled purchase. The user of the 3145 phone told the CS that he was out of the state obtaining more drugs, but could send his coworker to deliver what they had, which was only 10 ounces. The CS then set up the meeting to conduct the controlled purchase, which was successfully completed later that day based on the information provided by the user of the 3145 phone.

Several days later, officers were conducting "spot-checks" on the location of the 3145 phone, which officers knew had re-entered Utah, and then left again in the preceding days. Agent Smith testified that spot-checking "is a review every six hours or so of the G.P.S. location, which comes in to [their] emails from the service provider."[5] This type of surveillance is conducted "not to determine where . . . the subject is, other than to identify any reentry into the State of Utah."[6]

On the morning of August 3, 2021, agents saw that the 3145 phone had reentered Utah. Agent Smith then contacted local law enforcement agencies in the areas the phone was traveling through, hoping to identify and interdict the vehicle it was in and initiate a stop. At some point, Agent Smith contacted the Utah County Sheriff's Office and requested that they "attempt at a moving violation or traffic violation" on the vehicle, but explained "the reason behind the

---

[5] *Id.* at 17:21–23.

[6] *Id*. at 17:24–18:1.

3

request was it was a drug load."[7] He also provided a possible vehicle description: a white Ford F-150 with California license plates and darkened taillight covers. Later, Agent Smith was notified by a deputy from Utah County that a vehicle matching the description had been spotted in the area the ping data showed phone 3145 to be. Shortly after, Agent smith was notified that the vehicle had been stopped. Agent Smith testified he knew they had the vehicle carrying the 3145 phone because the ping data showed it had stopped moving after the traffic stop was initiated.

Sergeant King, a patrol sergeant with the Utah County Sheriff's Office, testified that, while patrolling, he was informed that a vehicle possibly carrying a drug load would be coming through the area northbound. He subsequently spotted a white truck with fogged out taillights that matched the vehicle description he had been provided and proceeded to follow it to try to get a traffic stop. As he followed the vehicle he noticed "the vehicle would drift off, cross the white fog line to the right, and by more than a tire's width, meaning the whole tire was over the white line, and then it would correct and drift back and come up and touch the centerline."[8] The vehicle did this approximately three times. Sergeant King testified that this is a traffic violation.[9] He also testified that the taillights being blacked out, is also a violation.[10] Due to his distance from the

---

[7] *Id.* at 21:4–6.

[8] *Id.* at 41:1–5.

[9] *See* Utah Code § 41-6a-710(1)(a) ("[A] person operating a vehicle: (i) shall keep the vehicle as nearly as practical entirely within a single lane; and (ii) may not move the vehicle from the lane until the operator has reasonably determined the movement can be safely made.").

[10] *See id.* § 41-6a-1601(1)(a)(ii) ("A person may not operate . . . a vehicle . . . that . . . is not at all times equipped with lamps . . . in proper condition . . . as required in this chapter."); *Id.* at § 41-6a-1601(2)(c)(iv) (adopting the standards enumerated in 49 C.F.R. 571.108 regarding "lights and illuminating devices"); 49 C.F.R. 571.108 (setting minimum standards for turn signal lamp and taillamp visibility and luminosity).

suspected vehicle, he then radioed to his fellow officers to initiate a traffic stop. Deputy Tyler

Hutchings ultimately initiated the stop.

Deputy Hutchings is a police officer for the Utah County Sheriff's Office. At the

supplemental hearing, he testified that he initiated a traffic stop on the subject Ford F-150.

Deputy Hutching approached the vehicle and identified Defendant as the driver. Upon request,

Defendant provided him with identification, which was issued by Mexico and not the United

States. Deputy Hutchings testified that the name on the identification Defendant provided, he

later learned, was not Defendant's actual name. Deputy Hutchings then returned to his patrol

vehicle and began searching for records associated with the name provided on the identification

or various iterations thereof. While he was running the names through the different databases,

Deputy Sorenson, a K-9 officer, arrived on scene. Deputy Hutchings testified that he and Deputy

Sorenson then discussed running the K-9 around the car to conduct an open-air sniff. At this

point, Deputy Hutchings had not yet completed a records check on Defendant's identification.

Before the officers conducted a drug sniff, Deputy Hutchings removed Defendant and the

passenger from the vehicle without incident and put them at the front of his patrol vehicle in

handcuffs. Deputy Hutchings testified the handcuffs were used for safety purposes. The K-9 sniff

was then conducted. The K-9 subsequently alerted on the vehicle, indicating the vehicle

contained illegal drugs. Deputy Hutchings estimated from the time he initiated the stop to the

time the K-9 positively indicated was roughly 20 minutes.

Officers then began a search of the vehicle. DEA agents arrived shortly thereafter and took over the investigation.[11] Agent Smith testified at the supplemental hearing that he arrived on scene and identified himself to the three law enforcement agents who were already there. He also observed two individuals "detained" in handcuffs on the side of the road, one of which was Defendant. The officers told him the K-9 had alerted on the vehicle. Agent Smith then went to the detainees and spoke to them "separately, but within eyesight of each other."[12] He proceeded to ask them a series of questions in Spanish, after showing them his badge, along the lines of: "What is your true name? Where are you from? This identification card--this is not legitimate. This is fake, correct? [He] asked about their travel itinerary and asked about the ownership of the truck and if there [were] any illegal items or contraband in the vehicle."[13] After conducting his questioning, Agent Smith went to assist with the search of vehicle, during which he found two cell phones in the center console. Meanwhile two additional agents—a task force officer and an ICE agent—arrived on scene joining the three deputies from the Utah County Sheriff's Office.

Agents eventually decided to tow the truck to the DEA office where they could search it more safely and thoroughly. They also transported Defendant and the passenger back to the DEA office. Upon arrival, Defendant and the passenger were seated on a bench in the common area of the office. Multiple armed police officers were present in the room. At this point, Agent Smith

---

[11] Docket 109, at 19:22.

[12] *Id.* at 23:6.

[13] *Id.* at 24:4–9.

asked them about ownership of the two phones that he found in the console.[14] He testified that: "I just either held up the phones and said 'are these yours' and his reply was 'yes,' or I said 'whose phones are these' and he replied 'mine.'"[15] He further explained that he asked them about the phone prior to issuing *Miranda* warnings because:

> The phones and other property that have value we need to determine ownership. For example, at the conclusion of this investigation, after all the defendants are adjudicated, we have to return peoples' property. If we don't ask what property belongs to who, we can't send a notice of abandonment out. In this case I will be sending the defendant a notice for the phone that he did claim and allow him a certain period of time to claim that property before D.E.A. destroys it.[16]

He testified that he did not ask about the phones for any other purpose at that time. However, he did call the 3145 phone number provided by the CS and confirmed that it was one of the cell phones found in the center console after asking Defendant who was the owner.

Meanwhile, DEA agents obtained a search warrant for the truck after about an hour. They then searched the truck more thoroughly and found false compartments in the truck wherein about ten pounds of methamphetamine and two pounds of heroin were stored. Defendant was then mirandized and further questioning ensued. Defendant then denied the 3145 phone was his.

---

[14] At the first evidentiary hearing, Agent Smith testified that he asked this question while the Defendant and his associate were on the side of the road. At the second hearing, he corrected his testimony after refreshing his memory that it was asked after they arrived at the DEA office.

[15] *Id*. at 29:11–14.

[16] *Id.* at 30:14–22.

## II.  DISCUSSION

### A.  PING WARRANT

Defendant first argues that "all evidence in this case must be suppressed because it is derived from the fruit of the poisonous ping searches of the phone ending in 3145."[17] For purposes of this analysis, the Court will assume that "pinging data" is a search under the Fourth Amendment.[18] In determining whether the search was in violation of the Fourth Amendment, the Court must conduct an analysis under federal court precedent, even where, as here, the search warrant at issue was issued by a state judge.[19]

Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[20] The Supreme Court has interpreted this language to require only three things:

> First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction

---

[17] Docket No. 101, at 7.

[18] *United States v. Barajas*, 710 F.3d 1102, 1108 (10th Cir. 2013) ("Like the district court, we will assume without deciding that pinging is a search, and proceed to [the defendant's] second and third arguments.").

[19] *United States v. Le*, 173 F.3d 1258, 1264–65 (10th Cir. 1999) ("It is well established in this circuit that in federal prosecutions the test of reasonableness in relation to the Fourth Amendment protected rights must be determined by Federal law even though the police actions are those of state police officers. . . . Therefore, the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended.") (internal quotation marks and citations omitted).

[20] U.S. CONST. amend IV.

for a criminal offense. Finally, warrants must particularly describe the things to be seized as well as the place to be searched.[21]

The Utah District Judge who issued the warrant was a "neutral magistrate," satisfying the first requirement. Regarding the second, "[a]n affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place."[22] Additionally, "[p]robable cause undoubtedly requires a nexus between the contraband to be seized or suspected criminal activity and the place to be searched."[23] In making this assessment, "a magistrate's task is to make a 'practical, common-sense decision' based on the totality of the circumstances as set forth in the affidavit."[24]

The facts stated in the Affidavit for Search Warrant at issue[25] assert as follows: Law enforcement officers began investigating Pedro Meza ("Meza"), who "had been involved in numerous cases with the DEA" and was suspected of being a supply source for various types of narcotics in the Salt Lake area. On July 26, 2021, a confidential source advised the agents that he had spoken to Meza and, among other things, Meza provided the CS with the 3145 phone as "the point of contact for Meza's Salt Lake area representative who would provide pound qualities of methamphetamine to the CS." The CS contacted the person with the 3145 phone and set up an

---

[21] *Dalia v. United States,* 441 U.S. 238, 255 (1979) (internal quotation marks and citations omitted).

[22] *United States v. Roach,* 582 F.3d 1192, 1200 (10th Cir. 2009) (internal quotation marks and citation omitted).

[23] *United States v. Rowland*, 145 F.3d 1194, 1203 (10th Cir. 1998) (internal quotation marks and citation omitted).

[24] *Id.* at 1204 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

[25] Submitted to the Court as Defendant's Exhibit D2 during the hearing.

in-person meeting and was advised that he could purchase a pound of methamphetamine for $2,500.00. The affidavit further states that "[a]gents believe locating the physical location of the cellphone using phone number 3145 will provide agents with the location of the individuals the CS met with . . . [and] that those individuals are couriers for [Meza] and their location will identify other involved individuals and stash houses where illegal narcotics are being stored."

Applying a common-sense approach, the Court finds the totality of the information provided in the affidavit establishes sufficient probable cause to support issuance of the warrant. According to the affidavit, the CS received the 3145 phone number of a Salt Lake-based contact from which pound-quantities of drugs could be purchased. This information came directly from Pedro Meza, who was suspected of being a significant source of the drug supply in Salt Lake and was well-known by the DEA for his involvement in drug trafficking. When the CS contacted the number, he was able to arrange for the purchase of additional drugs. This information establishes more than a "fair probability" that tracking the 3145 phone would lead to contraband or additional evidence of drug trafficking activities.

Finally, the warrant must provide a sufficiently particular description of the place to be searched, and the persons or things to be seized. "To this end, a search warrant must 'describe the items to be seized with as much specificity as the government's knowledge and circumstances allow.'"[26] Here, the warrant describes the subject property to be searched as "real or near real time 'pinging' or electronic tracking device information . . . for a period of 30 days, to include: . . . GPS (global positioning service) information," among other things. The Court

---

[26] *United States v. Suggs*, 998 F.3d 1125, 1132 (10th Cir. 2021) (quoting *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988)).

finds this is a sufficiently particular description. The warrant at issue, therefore, meets the necessary requirements to survive a Fourth Amendment challenge.

Defendant asserts that the following six bases demonstrate that the warrant was not valid and, therefore, all evidence therefrom must be excluded:

> (1) the state judge did not identify the source of his authority to issue the ping warrant; (2) the Utah Constitution and our Nation's common law restrain the authority of a Utah state judge to the geographic limits of the state of Utah; (3) the state judge could not have relied on the federal All Writs Act as a basis of his authority to issue the ping warrant; (4) the pings were unlawful *ab initio* because they exceeded the permissible bounds of the language of the warrant; (5) assuming the language of the ping warrant allowed for a search beyond Utah, the search warrant was *ultra vires* and *void ab initio* because it went beyond the issuing state judge's jurisdiction pursuant to the state Constitution and our common law; and (6) the text of the search warrant contains no provision requiring the service provider of the cellphone to ping phone 3145.[27]

Keeping mind that the Court must employ a common sense and flexible analysis[28] and that federal law, not state law, controls here, the Court does not find arguments 1, 2, 3, and 6 to invalidate the warrant under any relevant authority. However, even if one of these asserted errors did serve to invalidate the warrant, the Court still would not find suppression of the evidence to be justified under the exclusionary rule, because the Court finds the *Leon* "good-faith exception" would apply.[29] "The good-faith exception provides that 'evidence seized pursuant to the warrant

---

[27] Docket No. 101, at 9–10.

[28] *Barajas*, 710 F.3d at 1109 ("Courts should not invalidate a warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner.") (quoting *United States v. Ventresca,* 380 U.S. 102, 109 (1965)).

[29] *See United States v. Leon*, 468 U.S. 897 (1984).

need not be suppressed if the executing officer acted with an objective good-faith belief that the warrant was properly issued by a neutral magistrate.'"[30]

> In assessing whether an officer's reliance on an invalid warrant was reasonable, [courts] look at the process employed by officers in obtaining the warrant. For instance, it is indicative of good faith when the officer who prepares an affidavit is the same one who executes a search. And an officer's efforts to obtain approval of a warrant application from a superior and an attorney also indicate the officer was acting in good faith.[31]

Here, there the evidence presented at the hearings suggest the affidavit was prepared in good faith. Agent Smith testified that while he did not personally draft the affidavit in support of the warrant, he was familiar with it and a member of his team drafted it. Also, a member of his team would receive the ping data emails from AT&T and would then forward the data to him. The warrant also demonstrates that the preparer sought review by an attorney. No evidence was presented to suggest bad faith on behalf of Agent Smith or his team.

Next, "when determining whether an officer's reliance was objectively reasonable, our primary focus must be the text of the affidavit supporting the warrant."[32] For substantially the same reasons the Court found the warrant to be supported by probable cause, the Court finds that the officer's reliance on such language to be objectively reasonable. Therefore, even if the Court found the warrant to be invalid for one of the reasons argued by Defendant, suppression would not be warranted under the good faith exception to the exclusionary rule.

---

[30]  *Barajas*, 710 F.3d at 1110 (discussing GPS data) (quoting *United States v. Campbell*, 603 F.3d 1218, 1225 (10th Cir. 2010)).

[31]  *United States v. Cotto*, 995 F.3d 786, 796 (10th Cir. 2021) (internal citations omitted).

[32]  *Id.*

Arguments 4 and 5 do not appear to challenge the warrant itself, but instead argue that the scope of the warrant was exceeded by collecting ping data outside of Utah. As discussed, Agent Smith testified at the hearing that when his team was informed the phone was no longer in Utah, they would conduct periodic "spot checks." This involved receiving emails from AT&T every six hours or so only to "identify any reentry into the State of Utah."[33] Agents were not actively tracking the location of phone 3145 while it was outside of Utah. They were only receiving ping data to alert them as to when it had reentered their jurisdiction. Under analogous circumstances, courts have found similar "spot-checking" to be within the bounds of the Fourth Amendment, where agents review limited data outside of the scope for the sole purpose of identifying the data becomes within the scope of the issued warrant.[34] The Court finds such logic persuasive here and accordingly finds that the DEA's spot checks did not violate the Fourth Amendment.

Further, the ping data that ultimately led to the traffic stop at issue was collected while phone 3145 was in Utah. Defendant has not provided, nor can the Court find any case law to

---

[33] Docket 101-1, at 17:24–18:1.

[34] *See e.g., United States v. Mansoori*, 304 F.3d 635, 648 (7th Cir. 2002) (finding Fourth Amendment was not violated where agents who had received a wire-tap warrant were permitted to listen to conversations at frequent intervals for brief periods of time (known as "spot checking") to determine if the subject of the conversation fell within the scope of the warrant); *United States v. Sorapuru*, 902 F. Supp. 1322, 1330 (D. Colo. 1995), *aff'd sub nom. United States v. Bovie*, 120 F.3d 271 (10th Cir. 1997) ("Intermittent spot-checking of minimized calls is a reasonable permissible technique to monitor calls that may at the outset appear to involve purely personal matters but later turn out to be drug related.").

support that all data collected from the ping warrant must be excluded if the scope of the warrant was exceeded at any point.[35]

Based on the above analysis, the Court will not exclude any evidence on the basis that it was contrived from an unlawful or invalid ping warrant.

B.  INITIATION OF THE STOP

"A traffic stop, however brief, constitutes a seizure within the meaning of the Fourth Amendment, and is therefore only constitutional if it is reasonable."[36] A traffic stop is reasonable for purposes of Fourth Amendment analysis "if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."[37] Additionally, "[t]he police may stop a car if they have probable cause or a reasonable, articulable suspicion to believe the car is carrying contraband."[38] "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence."[39]

---

[35] *United States v. Moreno-Magana*, No. 15-CR-40058-DDC, 2016 WL 409227, at *15 (D. Kan. Feb. 3, 2016) ("[E]ven if T-Mobile's pinging of the phones while located outside Kansas exceeded the state court judge's statutory authority, this defect does not nullify the validity of all ping results. Defendants do not challenge the issuing judge's authority to order pinging of phones located in Kansas.").

[36] *United States v. Alvarez-Becerra*, 33 F. App'x 403, 406 (10th Cir. 2002) (quoting *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001)).

[37] *United States v. Cervine*, 347 F.3d 865, 870 (10th Cir. 2003) (quoting *United States v. Botero-Ospina,* 71 F.3d 783, 787 (10th Cir.1995)).

[38] *United States v. Chavez*, 534 F.3d 1338, 1343 (10th Cir. 2008).

[39] *Id*. at 1344 (quoting *United States v. Vasquez-Castillo,* 258 F.3d 1207, 1212 (10th Cir. 2001)).

The government bears the burden to show that the officer possessed the requisite suspicion.[40] Whether the officer had alternative motivations for initiating the stop is irrelevant to the Court's analysis. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."[41]

Sergeant King testified that he had been informed that a vehicle was traveling northbound in his vicinity and possibly carrying a drug load. He was further informed that the vehicle may be a white Ford F-150 with a California license plate and fogged out taillights. While on the lookout, Sergeant King noticed a vehicle matching this description and made the decision to follow it to see if he could spot a traffic violation and initiate a stop. As he followed the truck he was several cars back, but stated he noticed "the vehicle would drift off, cross the white fog line to the right, and by more than a tire's width, meaning the whole tire was over the white line, and then it would correct and drift back and come up and touch the centerline."[42] The vehicle did this approximately three times. Sergeant King testified that this is a traffic violation. He also testified that the taillights being blacked out, is also a violation. Due to his distance from the suspected vehicle, he then radioed to his fellow officers to initiate a traffic stop. Deputy Tyler Hutchings ultimately initiated the stop. Because the stop was initiated based on suspected traffic violations, the stop was justified at its inception on basis.

Further, pursuant to "the collective knowledge doctrine," Sergeant King and Deputy Hutchings had a reasonable suspicion that the Ford F-150 was carrying illicit substances into

---

[40] *United States v. Clarkson*, 551 F.3d 1196, 1200 (10th Cir. 2009).

[41] *Whren v. United States*, 517 U.S. 806, 813 (1996).

[42] Docket No. 101-1, at 41:1–5.

Utah from California. The collective knowledge doctrine applies where either: (1) "a number of individual law enforcement officers have pieces of the probable cause puzzle . . . [and] the individual officers have communicated the information they possess individual, thereby pooling their collective knowledge to meet the probable cause threshold;"[43] or (2) "one officer *has* probable cause to act and instructs another officer to act, but does not communicate the corpus of information known to the first officer that would justify the action."[44]

Agent Smith testified that, a few days before the traffic stop at issue, they had tried to get a traffic stop on the vehicle carrying the 3145 phone as it re-entered Utah. At some point during their efforts, a different law enforcement officer in the area of the 3145 phone (according to the ping data) had identified the white Ford F-150 as "suspicious." Ultimately, the officer was not able to initiate a stop. However, he did provide a description of the vehicle to the agents who ultimately provided it to the Utah County officers who initiated the stop.

While the DEA agents did not know that the Ford F-150 was carrying the 3145 phone, the fact that the a white Ford F-150, matching the exact description provided by a different law enforcement officer a few days prior, was again in the area the ping data showed the 3145 phone to be is strong evidence that the Ford F-150, with a California license plate and fogged out taillights, was in fact the vehicle carrying the 3145 phone. Further, for the reasons stated in the Affidavit supporting issuance of the warrant, DEA agents possessed strong evidence that the 3145 phone was with an individual transporting large amounts of illegal substances to the Salt Lake area. Such evidence is sufficient to demonstrate that the Utah County officers had a

---

[43] *Chavez,* 534 F.3d at 1345.

[44] *Id.*

reasonable suspicion that the Ford F-150 was carrying illicit substances under either application of the collective knowledge doctrine. Therefore, the Court finds that the stop was proper under the Fourth Amendment.

## C.  EXTENSION OF TRAFFIC STOP

Once the traffic stop is initiated, "an investigative detention must last no longer than necessary to effectuate the purpose of the stop."[45] "Under ordinary circumstances, this limits the officer to a request for the driver's license and registration, a computer check on the car and driver, an inquiry about the driver's travel plans, and the issuance of a citation."[46] If the officer extends the time of the stop beyond the purpose of the stop, the officer may only do so under two circumstances: "(1) if the officer has 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring'; or (2) 'if the initial detention has become a consensual encounter.'"[47]

Only the first basis is applicable here. Under this basis, if the stop was prolonged by a dog sniff, the government must show that the officer "acquire[d] a particularized and objective basis for suspecting" the individuals in the truck were carrying illicit substances.[48] In making that determination, the Court "look[s] at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal

---

[45] *Cervine,* 347 F.3d at 870–71 (quoting *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999)).

[46] *Id.* at 871.

[47] *Id.* (quoting *United States v. Gonzalez-Lerma,* 14 F.3d 1479, 1483 (10th Cir. 1994)).

[48] *Clarkson*, 551 F.3d at 1201 (quoting *United States v. Villa-Chaparro,* 115 F.3d 797, 801–02 (10th Cir. 1997)); *see also United States v. Pettit*, 785 F.3d 1374, 1379–80 (10th Cir. 2015).

wrongdoing.'"[49] In doing so, the court "accord[s] appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'"[50]

Alternatively, if the government shows "the dog sniff and alert were contemporaneous with the troopers' reasonably diligent pursuit of the stop's mission, the subsequent search of Defendant's vehicle and discovery of evidence [would] not violate his Fourth Amendment rights."[51]

At the first hearing, Sergeant King testified that it "would not surprise him" to learn that the K-9 unit arrived to conduct a drug sniff approximately seven minutes after Deputy Hutchings initiated a search on the identifications provided to him by Defendant and the passenger. However, at the supplemental hearing, Deputy Hutchings testified that he was actively running the names on the identifications provided to him (which did not reflect Defendant's real name) when the K-9 unit arrived. Therefore, there was no extension of the stop to conduct a dog-sniff. Rather, the dog sniff was contemporaneous with the stop's mission and was, therefore, proper under the Fourth Amendment.

D. *MIRANDA*

"The Fifth Amendment to the U.S. Constitution guarantees that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'"[52] Pursuant to the Supreme

---

[49] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks and citations omitted).

[50] *United States v. Alvarez*, 68 F.3d 1242, 1244 (10th Cir. 1995).

[51] *United States v. Mayville*, 955 F.3d 825, 833 (10th Cir. 2020).

[52] *United States v. Crisp*, 371 F. App'x 925, 927 (10th Cir. 2010) (unpublished) (quoting U.S. Const. amend. V).

Court's holding in *Miranda v. Arizona*, "a suspect's statements are generally inadmissible if law enforcement officers elicited them during a custodial interrogation without giving the prescribed warnings and obtaining a waiver."[53] Law enforcement officers need not administer *Miranda* warnings to everyone they question. "[T]wo requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'"[54]

First, the Supreme Court explained in *Miranda* that an individual is "in custody" if he is "deprived of his freedom of action in any significant way."[55]

> Whether a person is in custody for *Miranda* purposes depends on the type of the encounter with police.  Of the three types of police-citizen encounters—voluntary cooperation, an investigatory detention under *Terry v. Ohio*, and a formal arrest—*Miranda*'s custody element is triggered only in situations associated with formal arrests.[56]

"An individual is in custody for *Miranda* purposes when 'a reasonable person in the suspect's position would understand his or her situation as 'the functional equivalent of formal arrest.'"[57]

The custody determination is "an objective, fact-intensive inquiry that focuses on the totality of the circumstances."[58] "Traffic stops do not usually implicate *Miranda* concerns, since

---

[53] *Id.* (citing *Miranda*, 384 U.S. at 444).

[54] *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993).

[55] *Miranda*, 384 U.S. at 444.

[56] *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (citing *Terry v. Ohio*, 392 U.S. 1 (1969)).

[57] *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021) (quoting *United States v. Cortez*, 865 F.3d 827, 840 (10th Cir. 2020)).

[58] *Id.*

a traffic stop is typically noncoercive and nonthreatening."[59] However, certain circumstances, such as officers taking highly intrusive steps to protect themselves from danger, may prompt the need for *Miranda* warnings.[60]

The Tenth Circuit has avoided "hard line rules"[61] to determine whether a suspect is in custody, but has instead provided the following factors to guide the Court's determination of whether the stop amounts to a custodial interrogation:

> (1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [the Defendant] aware that [he] was free to refrain from answering questions, or to otherwise end the interview.[62]

"In engaging in this analysis, [courts] ignore the subjective views of the interrogating officers and focus only on what a reasonable person would have understood from the situation."[63]

The first factor weighs in favor of custody. Initially, after being stopped, Defendant was removed from his vehicle and placed in handcuffs at the front of a patrol vehicle while several agents conducted a K-9 sniff and then proceeded to search his vehicle.[64] Eventually, a total of six armed law enforcement officers from various organizations, including Utah County, DEA, and ICE, were on scene while he remained handcuffed on the side of the road. Later, Defendant was

---

[59] *United States v. Benard*, 680 F.3d 1206, 1211–12 (10th Cir. 2012).

[60] *Id.* at 1212.

[61] *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993).

[62] *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007).

[63] *Id.*

[64] *See Guillen*, 995 F.3d at 1110 (finding it significant that "[the defendant] was not placed in handcuffs or otherwise physically restrained during the interview" in determining whether the atmosphere was "police dominated.").

transported, separate from his associate, by a law enforcement officer to the DEA offices, which were over an hour away from where he was stopped. Once they arrived, he was kept in handcuffs and placed within the DEA office common area, where several armed police officers were present, while officers waited to obtain a search warrant for his vehicle.

The second factor is a closer call. Weighing against a finding of custody, Agent Smith's questioning was not lengthy, did not involve threats or coercion, and largely did not include accusatory statements or inquires. Weighing in favor of custody, Agent Smith questioned Defendant while he was handcuffed—both on the side of the road while numerous agents were searching his vehicle, and at the DEA office while other officers were in the area. Further, some of the questions Agent Smith testified that he asked were accusatory, including asking him to confirm that the identification he provided was fake and whether drugs would be found in the vehicle.

The third factor weighs strongly in favor of custody. As stated, Defendant was handcuffed on the side of the road while his vehicle was being searched. He was also later transported to the DEA's offices over an hour away and kept in handcuffs once he arrived and at when Agent Smith asked him if the 3145 phone belonged to him. Further, his vehicle was being held at the DEA office awaiting the issuance of a search warrant. Nobody informed him that he was free to leave or otherwise suggested he was not under arrest. No reasonable person in this situation would feel they were free to leave.

Upon a weighing of each of the factors and considering the totality of the circumstances, the Court finds that a reasonable person "in the suspect's position would understand his . . .

situation as 'the functional equivalent of formal arrest.'"[65] Significantly, he had no freedom to move about considering he and his associate were placed in handcuffs, and he had no means to leave the side of the road or the DEA office considering his vehicle was inaccessible. Further, the relevant questioning occurred while he was surrounded by armed law enforcement agents from several different law enforcement agencies and while his vehicle was being thoroughly searched for the presence of illegal substances.

Next, the Court must consider whether the questioning meets the legal definition of interrogation. The Supreme Court "has explained that interrogation includes 'any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"[66]

First, among other questions, Agent Smith testified that he asked Defendant, while he was handcuffed on the side of the road something along the lines of: "This identification card -- this is not legitimate. This is fake, correct?" and he asked if "there [were] any illegal items or contraband in the vehicle." A police officer should know that an affirmative answer to either of these questions would elicit an incriminating response from the suspect, as supplying a fake

---

[65] *Cortez*, 965 F.3d at 840 (quoting *Revels*, 510 F.3d at 1273).

[66] *Perdue*, 8 F.3d at 1464 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

identification to a law enforcement officer[67] and possession of illegal substances or contraband[68] are crimes.

Second, Agent Smith testified that shortly after they arrived at the DEA office, he asked Defendant and his associate to whom the two cell phones he found in the center console of the F-150 belonged. He testified that this question was only for the purpose of determining who the property would need to be returned to, in the event those proceedings became necessary. However, under the circumstances, a police officer would know that admission to ownership of the 3145 phone would illicit an incriminating response. In this case, the ping warrant was issued based on a probable cause statement supporting that the owner of the phone was the Salt Lake point of contact for purchase of wholesale illicit substances sources from the Sinaloa-based drug cartel. At the time Agent Smith asked the question, he had not yet determined who owned the 3145 phone, but Agent Smith testified that he "knew" agents had stopped the right vehicle because after the traffic stop was initiated, the ping data showed the 3145 phone had stopped moving. Agent Smith also testified that he saw one phone with the passenger and found two phones in the F-150. At the time he asked the question, he would have known that determining

---

[67] *See e.g.* 18 U.S.C. § 1028 (providing federal penalties for production of false identification document that effects interstate or foreign commers); Utah Code Ann. § 76-6-501.5(2)(a) ("An actor commits producing or transferring a false identification document [a second degree felony] if the actor . . . knowingly and without lawful authority produces . . . a false identification document that is or appears to be issued by or under the authority of an issuing authority.");  Utah Code Ann. § 76-8-507(1) ("A person commits a class C misdemeanor if, with intent of misleading a peace officer as to the person's identity, birth date, or place of residence, the person knowingly gives a false name, birth date, or address to a peace officer in the lawful discharge of the peace officer's official duties.").

[68] *See generally* 21 U.S.C. 801 *et seq.*

which of the two detainees possessed the 3145 phone would also identify the Salt Lake point of contact for the Sinaloa-based drug cartel.

Based on the above analysis, the Court finds that the statements Defendant made in response to questioning, pre-*Miranda*, both on the side of the road and in the DEA offices were elicited in violation of *Miranda* and, accordingly, are inadmissible.

### III.  CONCLUSION

It is therefore

ORDERED that Defendant's Motion to Suppress (Docket No. 61) is GRANTED IN PART as set forth above.

DATED this 1st day of May, 2024.

BY THE COURT:

_____

Ted Stewart
United States District Judge